[No. S148204. Nov. 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER WILLIAM MENTCH, Defendant and Appellant.

## Counsel

Lawrence A. Gibbs, under appointment by the Supreme Court, and Joseph M. Bochner, under appointment by the Court of Appeal, for Defendant and Appellant.

Drug Policy Alliance, Daniel Abrahamson, Tamar Todd and Theshia Naidoo for Marcus A. Conant, Robert J. Melamede and Gerald F. Uelmen as Amici Curiae on behalf of Defendant and Appellant.

Joseph D. Elford for Americans for Safe Access as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Donald E. de Nicola, Deputy State Solicitor General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gerald A. Engler, Assistant Attorney General, Moona Nandi, Laurence K. Sullivan and Michele J. Swanson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—The Compassionate Use Act of 1996 (Act; Health & Saf. Code, § 11362.5, added by voter initiative, Prop. 215, Gen. Elec. (Nov. 5, 1996)) provides partial immunity for the possession and cultivation of marijuana to two groups of people: qualified medical marijuana patients and their primary caregivers. We consider here who may qualify as a primary caregiver. We hold that a defendant whose caregiving consisted principally of

supplying marijuana and instructing on its use, and who otherwise only sporadically took some patients to medical appointments, cannot qualify as a primary caregiver under the Act and was not entitled to an instruction on the primary caregiver affirmative defense. We further conclude that nothing in the Legislature's subsequent 2003 Medical Marijuana Program (Health & Saf. Code, § 11362.7 et seq.) alters this conclusion or offers any additional defense on this record. Accordingly, we reverse the Court of Appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Roger William Mentch was arrested and charged with the cultivation of marijuana (Health & Saf. Code, § 11358)[1] and its possession for sale (§ 11359).[2]

*Prosecution Evidence*

Heidi Roth, a teller at Monterey Bay Bank, testified that she became familiar with Mentch over the period of February to April 2003. Mentch came to the bank on several occasions and made large deposits of cash in small bills, each deposit totaling over $2,000. Roth noticed that some of the money Mentch deposited smelled so strongly of marijuana that the smell filled the bank, and the bank had to remove the money from circulation. The total amount Mentch deposited with the bank over a two-month period was $10,750. On April 15, 2003, Roth filed a suspicious activity report with the Santa Cruz County Sheriff's Office, relating the questionable nature of Mentch's deposits.

After further investigation, the sheriff's office obtained a warrant to search Mentch's house for marijuana. On June 6, 2003, Mark Yanez, a narcotics investigator, and four deputies went to Mentch's house to serve the warrant. When Mentch opened the door, Yanez told him they had a warrant to search his house for marijuana. Mentch told Yanez that he had a medical recommendation for marijuana. A search of Mentch's person turned up $253 in cash and a small vial of hash oil, or concentrated cannabis. Yanez advised Mentch of his rights and interviewed him in a police vehicle parked outside Mentch's residence.

---

[1] All further unlabeled statutory references are to the Health and Safety Code.

[2] Mentch was also charged with manufacturing and possessing concentrated cannabis (also known as hash oil) (§§ 11357, subd. (a), 11379.6, subd. (a)), possessing psilocybin mushrooms (§ 11377, subd. (a)), and firearm enhancements for the marijuana and hash oil counts (Pen. Code, § 12022, subd. (a)(1)), but these additional counts have no bearing on the issues in this appeal, and we do not address them further.

Mentch told Yanez he had a medical marijuana recommendation for colitis, dysphoria, and depression, and that he smoked about four marijuana cigarettes, totaling approximately one-sixteenth of an ounce, per day for medicinal purposes. When Yanez asked Mentch if he sold marijuana, Mentch responded that he sold it to five medical marijuana users.

A search of Mentch's residence revealed several elaborate marijuana growing setups. In various rooms of the house, the deputies found 82 marijuana plants in the flowering or budding stage, 57 "clone" marijuana plants, 48 marijuana plants in the growing or vegetative stage, and three "mother" plants, which Yanez opined were likely the female plants from which clippings were taken to make the clone plants. Considering the evidence seized from Mentch's bank and residence, as well as his statement to Yanez, Yanez opined that while Mentch may have personally consumed some of the marijuana he grew, his operation was primarily a for-profit commercial venture.

### Defense Evidence

Leland Besson testified that he had known Mentch for two years. In June 2003, Besson was on disability and had a medical marijuana recommendation for a bad back, neck, and joints. At the time, he was smoking approximately two to three grams of marijuana a day. For about one year before Mentch was arrested, Besson purchased his marijuana exclusively from Mentch, who knew about Besson's medical marijuana recommendation. Mentch supplied medical marijuana through his business, the Hemporium. Besson gave Mentch $150 to $200 in cash every month for one and one-half ounces of marijuana, the amount Besson usually consumed in a month.

Laura Eldridge testified she had known Mentch for about three years. In June 2003, she was working as a caretaker for Besson, cooking and cleaning for him, driving him to the grocery store, and driving him to medical appointments and to pick up his medications. Eldridge also drove Besson to Mentch's house to get him his marijuana. The only time Besson saw Mentch was when Eldridge took him to Mentch's house to get marijuana.

At the time, Eldridge herself had a medical marijuana recommendation for migraine headaches and posttraumatic stress disorder. She was smoking about five or six marijuana cigarettes a day and consuming about one ounce of marijuana a month. Eldridge obtained marijuana exclusively from Mentch for approximately one and one-half years before his arrest. Mentch provided the marijuana through his medical marijuana business, the Hemporium. Eldridge obtained the marijuana from Mentch every month, paying him $200 to $250

in cash for one ounce and $25 in cash for one-eighth of an ounce if she needed more.

Eldridge was at Mentch's house getting her daughter ready for school on the morning of Mentch's arrest. At the time, she and Mentch were not living together but were seeing each other romantically, and Eldridge had stayed over at Mentch's house the night before the search warrant was served.

Mentch took the stand in his own defense. In 2002, he obtained a medical marijuana recommendation and began growing marijuana. He learned how to grow marijuana from reading books, searching the Internet, and talking to people. He kept marijuana plants in all three stages of growth so that he was in a constant cycle of marijuana production, which produced a yield of four harvests a year. Mentch's medical marijuana recommendation was still current on the day the police searched his home. At that time, he smoked four to six marijuana cigarettes a day (approximately one-sixteenth of an ounce) and consumed between one and one-half to two ounces of marijuana a month.

Mentch opened the Hemporium, a caregiving and consultancy business, in March 2003. The purpose of the Hemporium was to give people safe access to medical marijuana. Mentch regularly provided marijuana to five other individuals, including Besson, Eldridge, and a man named Mike Manstock. Sometimes he did not charge them. All five individuals had valid medical marijuana recommendations. Mentch did not provide marijuana to anyone who did not have a medical marijuana recommendation. Occasionally, he took any extra marijuana he had to two different cannabis clubs, The Third Floor and another unnamed place. Although a majority of the marijuana plants in Mentch's home belonged to him, some belonged to Manstock. In addition, Mentch let Besson and Eldridge grow one or two plants.

Mentch provided marijuana to Besson about once every month and to Eldridge about once or twice every month. On average, they each gave him $150 to $200 for an ounce and a half of marijuana a month. Mentch considered his marijuana "high-grade" and provided it to Besson and Eldridge for less than street value. He used the money they paid him to pay for "nutrients, utilities, part of the rent." Mentch did not profit from his sales of marijuana, and sometimes he did not even recover his costs of growing it. Mentch counseled his patients/customers about the best strains of marijuana to grow for their ailments and the cleanest way to use the marijuana. He took a "couple of them" to medical appointments on a "sporadic" basis.

Although Mentch asked all five patients to come to court and testify on his behalf, only Besson and Eldridge showed up. He did not subpoena the others

because one of them was out of state, another did not want to be involved because his father was an attorney, and the third did not want to testify.

### The Primary Caregiver Defense

Before trial, the prosecutor filed a motion in limine to exclude any references by counsel during voir dire, testimony, or closing argument to Mentch's being a "primary caregiver" for Eldridge or Besson.[3] The prosecutor asserted that Eldridge and Besson could testify to any care Mentch had provided them, but argued that the ultimate determination whether Mentch was a primary caregiver rested with the jury. The trial court granted the motion.

After Eldridge and Besson testified, the court concluded the evidence was insufficient to show that Mentch had provided primary caregiver services. Mentch argued in a brief to the court that a person could qualify as a patient's primary caregiver whenever he or she consistently assumed responsibility for a patient's health by providing medical marijuana upon a doctor's recommendation or approval. The trial court rejected the argument.

During the subsequent discussion of jury instructions after the close of evidence, Mentch requested the standard jury instruction for affirmative defenses under the Act (CALJIC No. 12.24.1) on the theory that he was both a qualified patient entitled to cultivate marijuana for himself and a primary caregiver entitled to cultivate marijuana and possess it for sale to others. The trial court agreed to give the instruction insofar as it articulated a qualified patient defense but, consistent with its prior rulings, omitted the optional portion of the instruction relating to the primary caregiver defense.[4]

---

[3] The Act extends limited immunity from state prosecution for cultivation or possession to both qualified patients and their designated "primary caregiver[s]." (§ 11362.5, subd. (d).)

[4] At the time of trial, CALJIC No. 12.24.1 provided: "The [possession] [or] [cultivation] [or] [transportation] of marijuana is not unlawful when the acts of [defendant] [*a primary caregiver*] are authorized by law for compassionate use. The [possession] [or] [cultivation] [or] [transportation] of marijuana is lawful (1) where its medical use is deemed appropriate and has been recommended or approved, orally or in writing, by a physician; (2) the physician has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief; [and] (3) the marijuana [possessed] [cultivated] [transported] was for the personal medical use of [the patient] [____][.] [; and (4) the quantity of marijuana [[possessed] [or] [cultivated], and the form in which it was possessed were reasonably related to the [patient's] [____] then current medical needs[.]] [transported, and the method, timing and distance of the transportation were reasonably related to the [patient's] [____] then current medical needs.] [¶] [*A 'primary caregiver' is an individual designated by [the person exempted]* [ *(name)* ] *who has consistently assumed responsibility for the housing, health, or safety of that person.*] [¶] ['Recommendation' and 'approval' have different meanings. To 'recommend' something is to present it as worthy of acceptance or trial. To

*The Jury's Verdict and Subsequent Proceedings*

So instructed, the jury convicted Mentch of both cultivation and possession for sale. (§§ 11358, 11359.) The trial court suspended imposition of sentence and imposed three years' probation.

The Court of Appeal reversed Mentch's convictions. It concluded: "Where, as here, [Mentch] presented evidence that he not only grew medical marijuana for several qualified patients, but also counseled them on the best varieties to grow and use for their ailments and accompanied them to medical appointments, albeit on a sporadic basis, there was enough evidence to present to the jury." Because there was sufficient evidence to support an instruction on the primary caregiver defense, the trial court erred by redacting all references to it in CALJIC No. 12.24.1. (See *People v. Michaels* (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032] [defendant has a right to have the trial court give a jury instruction on any affirmative defense for which the record contains substantial evidence].)

We granted review to address the meaning of "primary caregiver" under the Act.

DISCUSSION

I. *The Primary Caregiver Defense*

A. *The Meaning of "Primary Caregiver"*

■ We interpret voter initiatives using the same principles that govern construction of legislative enactments. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226].) Thus, we begin with the text as the first and best indicator of intent. (*Ibid.*; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) If the text is ambiguous and supports multiple interpretations, we may then turn to extrinsic sources such as ballot summaries and arguments for insight into the voters' intent. (*Professional Engineers*, at

---

'approve' something is to express a favorable opinion of it. The word 'recommendation,' as used in this instruction, suggests the physician has raised the issue of marijuana use and presented it to the patient as a treatment that would benefit the patient's health by providing relief from an illness. The word 'approval,' on the other, suggests the patient has raised the issue of marijuana use, and the physician has expressed a favorable opinion of marijuana use as a treatment for the patient.] [¶] To establish the defense of compassionate use, the burden is upon the defendant to raise a reasonable doubt as to guilt of the unlawful [possession] [or] [cultivation] [or] [transportation] of marijuana." (CALJIC No. 12.24.1 (2004 rev.) (7th ed. 2003), italics added.) The italicized portions, governing the primary caregiver defense, were in dispute, and the trial court omitted them from its instructions.

p. 1037; *Legislature v. Eu* (1991) 54 Cal.3d 492, 504 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 673, fn. 14 [194 Cal.Rptr. 781, 669 P.2d 17].)

Section 11362.5, subdivision (d) provides: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." In turn, section 11362.5, subdivision (e) defines "primary caregiver" as "the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."

■ This statutory definition has two parts: (1) a primary caregiver must have been designated as such by the medicinal marijuana patient; and (2) he or she must be a person "who has consistently assumed responsibility for the housing, health, or safety of" the patient. It is clear from the structure of subdivision (e) of section 11362.5 that this latter part of the definition has additional restrictive power, or else the subdivision would have ended with the phrase "by the person exempted under this section," thereby allowing every patient to designate one person without limitation. Thus, to qualify for exemption under this subdivision, a person must satisfy both halves—the "designee" clause and the "responsibility" clause. (See *People v. Mower* (2002) 28 Cal.4th 457, 475 [122 Cal.Rptr.2d 326, 49 P.3d 1067] ["For a person to be a qualified primary caregiver, he or she must be 'designated' as such by a qualified patient, *and* must have 'consistently assumed responsibility' for the qualified patient's 'housing, health, or safety.' " (Italics added.)].) Designation is necessary, but not sufficient. (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 773 [33 Cal.Rptr.3d 859]; *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1397 [70 Cal.Rptr.2d 20].)

■ Three aspects of the structure of the responsibility clause are noteworthy. From these aspects, as we shall explain, we conclude a defendant asserting primary caregiver status must prove at a minimum that he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana.

First, the text requires that the primary caregiver have "consistently" assumed responsibility for the patient's care. "Consistently" suggests an ongoing relationship marked by regular and repeated actions over time. In *People ex rel. Lungren v. Peron, supra,* 59 Cal.App.4th 1383, for example, the many customers of a marijuana club, the Cannabis Buyers' Club,

executed pro forma designations of the club as their primary caregiver. The Court of Appeal correctly rejected the assertion that the buyers' club could qualify as a primary caregiver in these circumstances: "A person purchasing marijuana for medicinal purposes cannot simply designate seriatim, and on an ad hoc basis, drug dealers on street corners and sales centers such as the Cannabis Buyers' Club as the patient's 'primary caregiver.' The primary caregiver the patient designates must be one 'who has *consistently* assumed responsibility for the housing, health, or safety of [the patient].' " (*Id.* at p. 1396.) One must consistently—"with persistent uniformity" (3 Oxford English Dict. (2d ed. 1989) p. 773) or "in a persistent or even manner" (Webster's 3d New Internat. Dict. (2002) p. 484)—have assumed responsibility for a patient's housing, health, or safety, or some combination of the three.

Second, the definition of a primary caregiver is written using a past participle—"has consistently assumed." (§ 11362.5, subd. (e).) This reinforces the inference arising from the use of the word "consistently" that primary caregiver status requires an existing, established relationship. In some situations, the formation of a bona fide caregiving relationship and the onset of assistance in taking medical marijuana may be contemporaneous, as with a cancer patient entering chemotherapy who has a recommendation for medical marijuana use and has a live-in or home-visit nurse to assist with all aspects of his or her health care, including marijuana consumption. (See § 11362.7, subd. (d)(1) [primary caregiver may include employees of hospice or home health agency].) Even in this scenario, however, the caregiving relationship will arise at or before the onset of assistance in the administration of marijuana. What is not permitted is for an individual to establish an after-the-fact caregiving relationship in an effort to thereby immunize from prosecution previous cultivation or possession for sale. (Cf. *People v. Rigo* (1999) 69 Cal.App.4th 409, 412–415 [81 Cal.Rptr.2d 624] [doctor may not give postarrest recommendation to bless prior use].)[5]

Third, from these two aspects of the text, as well as logic, we draw a further inference: a primary caregiver must establish he or she satisfies the responsibility clause based on evidence independent of the administration of medical marijuana. Under the Act, a primary caregiver relationship is a necessary antecedent, a predicate for being permitted under state law to possess or cultivate medical marijuana. The possession or cultivation of marijuana for medical purposes cannot serve as the basis for making lawful

---

[5] In holding that the assumption of primary caregiver responsibilities cannot apply retroactively to immunize prior cultivation or possession of marijuana, we do not suggest it would not apply prospectively. Defendants who show they satisfied all other prerequisites for primary caregiver status for a given patient at some point after the onset of providing marijuana may avail themselves of the defense going forward, even if they remain subject to prosecution for actions taken prior to assumption of a primary caregiver role.

the possession or cultivation of marijuana for medical purposes; to conclude otherwise would rest the primary caregiver defense on an entirely circular footing.

We thus agree with the Court of Appeal in *People v. Frazier* (2005) 128 Cal.App.4th 807, 823 [27 Cal.Rptr.3d 336], which rejected the argument that "a 'primary caregiver' is a person who 'consistently grows and supplies physician approved marijuana for a medical marijuana patient to serve the health needs of that patient' . . . ." The *Frazier* court concluded that, while *if* one were already qualified as a primary caregiver one could consistently grow and supply medical marijuana to a patient, the consistent growth and supply of medical marijuana would not by itself place one in the class of primary caregivers. (*Ibid.*; see also *People v. Windus* (2008) 165 Cal.App.4th 634, 644 [81 Cal.Rptr.3d 227] ["Case law is clear that one who merely supplies a patient with marijuana has no defense under the [Act]."].)[6]

The trial court accurately assessed the law when, in denying Mentch's request for a primary caregiver instruction, it explained: "I'm satisfied that simply providing marijuana, in and of itself to these folks does not—you don't bootstrap yourself to becoming the primary caregiver because you're providing [marijuana]" and "you have to be a caregiver *before* you can provide the marijuana." (Italics added.) Later, in denying Mentch's motion for a judgment of acquittal (Pen. Code, § 1118.1), the trial court reiterated the point: "There has to be something more to be a caregiver than simply providing marijuana. Otherwise, there would be no reason to have the definition of a caregiver, because anybody who would be providing marijuana and related services would qualify as a caregiver[,] therefore giving them a defense to the very activity that's otherwise illegal, and I don't think that makes any sense in terms of statutory construction, nor do I think it was intended by the people or the Legislature."

Mentch himself highlights the dog-chasing-its-tail absurdity of allowing the administration of medical marijuana to patients to form the basis for authorizing the administration of medical marijuana to patients in his attempts to

---

[6] Mentch directs us to the Attorney General's Act guidelines concerning medical marijuana (see § 11362.81, subd. (d)) as supporting a contrary definition of "primary caregiver," but in fact the guidelines are wholly consistent with case law and the statutory text and afford Mentch no support. The guidelines note: "Although a 'primary caregiver who consistently grows and supplies . . . medicinal marijuana for a section 11362.5 patient is serving a health need of the patient,' someone who merely maintains a source of marijuana does not automatically become the party 'who has consistently assumed responsibility for the housing, health, or safety' of that purchaser." (Cal. Atty. Gen., Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008) pt. II.B., p. 4.) They do not suggest provision of medical marijuana is alone sufficient to qualify one as a primary caregiver, but recognize instead that the provision of marijuana may be one part of caregiving for an ailing patient.

distinguish this case from *People ex rel. Lungren v. Peron, supra,* 59 Cal.App.4th 1383, and *People v. Urziceanu, supra,* 132 Cal.App.4th 747. *Peron* and *Urziceanu,* he argues, involved only casual or occasional provision of medical marijuana; here, in contrast, he "consistently" provided medical marijuana, "consistently" allowed his patients to cultivate medical marijuana at his house, and was his five patients' "exclusive source" for medical marijuana. The essence of this argument is that the occasional provision of marijuana to someone is illegal, but the frequent provision of marijuana to that same person may be lawful. The vice in the approach of the cooperatives at issue in *Peron* and *Urziceanu* therefore evidently was not that they provided marijuana to their customers; it was that they did not do it enough.

Nothing in the text or in the supporting ballot arguments suggests this is what the voters intended. The words the statute uses—housing, health, safety—imply a caretaking relationship directed at the core survival needs of a seriously ill patient, not just one single pharmaceutical need. The ballot arguments in support suggest a patient is generally personally responsible for noncommercially supplying his or her own marijuana: "Proposition 215 allows patients to cultivate their own marijuana simply because federal laws prevent the sale of marijuana, and a state initiative cannot overrule those laws." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 215, p. 60.) But as the focus is on the "seriously and terminally ill" (*ibid.*), logically the Act must offer some alternative for those unable to act in their own behalf; accordingly, the Act allows " 'primary caregiver[s]' the same authority to act on behalf of those too ill or bedridden to do so" (*People ex rel. Lungren v. Peron, supra,* 59 Cal.App.4th at p. 1394). To exercise that authority, however, one must be a "primary"—principal, lead, central— "caregiver"—one responsible for rendering assistance in the provision of daily life necessities—for a qualifying seriously or terminally ill patient.[7]

We note in passing that some other states in adopting their own medical marijuana compassionate use acts have adopted substantially different and manifestly broader language in defining their primary caregiver exceptions. In New Mexico, for example, a primary caregiver is "a resident of New Mexico

---

[7] The Act is a narrow measure with narrow ends. As we acknowledged only months ago, " 'the proponents' ballot arguments reveal a delicate tightrope walk designed to induce voter approval, which we would upset were we to stretch the proposition's limited immunity to cover that which its language does not.' " (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 930 [70 Cal.Rptr.3d 382, 174 P.3d 200], quoting *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1152 [128 Cal.Rptr.2d 844].) The Act's drafters took pains to note that "neither relaxation much less evisceration of the state's marijuana laws was envisioned." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1546 [66 Cal.Rptr.2d 559]; see also *People v. Urziceanu, supra,* 132 Cal.App.4th at pp. 772–773 [the Act "is a narrowly drafted statute," not an attempt to "decriminalize marijuana on a wholesale basis"].) We must interpret the text with those constraints in mind.

who is at least eighteen years of age and who has been designated by the patient's practitioner as being necessary to take responsibility for managing the well-being of a qualified patient with respect to the medical use of cannabis." (N.M. Stat. § 26-2B-3, par. F; see also Vt. Stat. Ann. tit. 18, § 4472, subd. (6) [registered caregiver must be 21 years old, must have no drug convictions, and must have "agreed to undertake responsibility for managing the well-being of a registered patient with respect to the use of marijuana for symptom relief"].) Had the drafters of the Act intended the broad understanding of "primary caregiver" that Mentch urges, they might well have been expected to select similar language. They did not.[8]

We have no doubt our interpretation of the statute will pose no obstacle for those bona fide primary caregivers whose ministrations to their patients the Act was actually intended to shield from prosecution. The spouse or domestic partner caring for his or her ailing companion, the child caring for his or her ailing parent, the hospice nurse caring for his or her ailing patient—each can point to the many ways in which they, medical marijuana aside, attend to and assume responsibility for the core survival needs of their dependents. The Act allows them, insofar as state criminal law is concerned, to add the provision of marijuana, where medically recommended or approved, as one more arrow in their caregiving quiver. It simply does not provide similar protection where the provision of marijuana is itself the substance of the relationship.

B. *Sufficiency of the Evidence to Support an Instruction on the Primary Caregiver Affirmative Defense*

We turn to the merits of Mentch's request for a primary caregiver instruction in light of the evidence he adduced and the evidence he sought to adduce.

---

[8] More generally, we note that in the 12 states to have adopted compassionate use acts, all such states' acts include a primary caregiver exception or its equivalent, and virtually all include some mechanism for limiting primary caregiver status so the exception does not swallow the rule. Most rely on either mandatory state registries (Alaska Stat. § 17.37.010, subds. (a), (q) [Alaska]; Mont. Code Ann. § 50-46-201 [Montana]; N.M. Stat. § 26-2B-4, par. D [New Mexico]) or confine each caregiver to a set number of patients (Wn. Rev. Code § 69.51A.010 (1)(d) [Washington]) or both (Haw. Rev. Stat. § 329-123, subd. (c) [Hawaii]; R.I. Gen. Laws §§ 21-28.6-3, subd. (6), 21-28.6-4, subd. (c) [Rhode Island]; Vt. Stat. Ann. tit. 18, § 4474, subds. (a), (c) [Vermont]).

A minority (Colorado, Nevada, and Oregon) have instead adopted California's approach of limiting the caregiver exception by using a higher standard for the nature of the relationship and responsibility assumed. (See Colo. Const., art. XVIII, § 14, subd. (1)(f) [must have "significant responsibility for managing the well-being of a patient who has a debilitating medical condition"]; Nev. Rev. Stat. § 453A.080, subsec. 1(b) [must have "significant responsibility for managing the well-being of a person diagnosed with a chronic or debilitating medical condition"]; Or. Rev. Stat. § 475.302, subsec. (5) [must have "significant responsibility for managing the well-being of a person who has been diagnosed with a debilitating medical condition"].)

■ "It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40]; see also *People v. Michaels, supra,* 28 Cal.4th at p. 529.) On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence— evidence that, if believed by a rational jury, would have raised a reasonable doubt as to whether Mentch was a primary caregiver and thus innocent of unlawful possession or cultivation.

Mentch relies on three strands of evidence: his alleged provision of shelter to one patient, his taking of other patients to medical appointments, and his ongoing provision of both marijuana and marijuana advice and counseling to all his patients. Even crediting this evidence, as we must for purposes of deciding whether he was entitled to an instruction, we discern a series of interrelated shortcomings. Some of Mentch's caregiving was independent of providing marijuana, but was not provided at or before the time he began providing marijuana. Some of it may have been at or before the time he began providing marijuana, but was not consistent. And some of it was consistent, but was not independent of providing marijuana. But none of the evidence demonstrated satisfaction of *each* of the three aspects of the responsibility clause we have identified; none of it was sufficient to raise a reasonable doubt as to whether Mentch had provided his patients consistent caregiving, independent of providing them marijuana, at or before the time he began providing them marijuana.

First, Mentch argues Eldridge moved in shortly before the June 6, 2003, search. Unfortunately for Mentch's argument, the record directly contradicts this assertion. Eldridge testified she lived elsewhere at the time, and Mentch did not testify to the contrary. Even if the record supported it, however, the argument would not address the lack of any evidence of a primary caregiving relationship during the preceding year and a half during which Mentch was, by his own admission, selling Eldridge marijuana; it would not retroactively bless Mentch's prior cultivation of marijuana and sale of marijuana to her.

Second, Mentch testified he took "a couple" patients to medical appointments "sporadically." A sporadic assumption of responsibility is the antithesis of a consistent assumption of responsibility; it cannot satisfy the responsibility clause.

■ Third, Mentch otherwise relied almost exclusively on the provision of medical marijuana to establish a primary caregiving relationship. But the evidence must establish an assumption of responsibility independent of the provision of medical marijuana. This shortcoming is also intertwined with Mentch's problems showing a consistent assumption of responsibility: what "caregiving" was consistent consisted only of providing marijuana, while what caregiving was independent of providing marijuana was not consistent.

There is a final overarching problem with the evidence. Mentch testified to providing marijuana to five patients and also to occasionally growing too much and providing the excess to marijuana clubs. But where, as here, Mentch was charged with single counts of possession and cultivation, primary caregiver status would provide Mentch a defense only if it extended to all the marijuana he possessed or cultivated. Consider, for example, a defendant who testified that he (1) grew marijuana, (2) gave half to his critically ill daughter, a qualified patient for whom he was the designated primary caregiver and by whom he was reimbursed for growing expenses, and (3) sold the other half on the street. However much the primary caregiver defense might protect his actions toward his daughter, it would have no bearing on his case because a portion of his distribution of marijuana for money would be unprotected from state prosecution. Similarly, Mentch's testimony that he "sporadically" took "a couple" of the five patients to medical appointments, and his assertion (unsupported by the record) that he provided Eldridge shelter, would, even if believed, do nothing to insulate from prosecution his cultivation of and sale of marijuana to those for whom he did not provide shelter or nonmarijuana-based health care. (See *People v. Urziceanu, supra,* 132 Cal.App.4th at p. 773 [rejecting primary caregiver defense because the defendant failed to adduce evidence he was "the primary caregiver for *all* of the patients who patronized his cooperative" (italics added)].) Nor would it protect him from prosecution for cultivating marijuana and providing it to cannabis clubs. (See *People v. Galambos, supra,* 104 Cal.App.4th at pp. 1165–1167 [the primary caregiver defense does not extend to supplying marijuana to a cooperative]; *People v. Trippet, supra,* 56 Cal.App.4th at p. 1546 [noting with approval a ballot pamphlet argument that the Act was not intended to protect " 'anyone who grows too much, or tries to sell it' "]; Ballot Pamp., Gen. Elec. (Nov. 5, 1996) rebuttal to argument against Prop. 215, p. 61.)[9]

---

[9] Mentch's primary caregiver defense depended on the jury's crediting his own testimony on the scope of his cultivation and distribution of marijuana. This is not a case where, on the record presented, a rational jury could credit some evidence that supported a primary caregiver defense and disbelieve other evidence that suggested marijuana cultivation or possession above and beyond that immunized from state prosecution by the Act. Nor is it a case where a defendant was charged with multiple counts and a rational jury could conclude the Act provided a complete defense to some counts but not others.

The Court of Appeal appropriately recognized that the right to a jury resolution of all disputed factual issues is to be jealously protected. However, trial courts are still responsible for acting as gatekeepers and determining whether the evidence presented, considered in the light most favorable to the defendant, could establish an affirmative defense—here, whether it could give rise to a reasonable doubt as to the existence of an established, legally cognizable primary caregiving relationship. The trial court properly fulfilled its role here in declining to give a primary caregiver instruction on this record.

## II. Defenses Under the Medical Marijuana Program

Before us, Mentch contends in the alternative that the 2003 enactment of the Medical Marijuana Program (Program; § 11362.7 et seq.) provides a defense to cultivation and possession for sale charges for those who give assistance to patients and primary caregivers in (1) administering medical marijuana, and (2) acquiring the skills necessary to cultivate or administer medical marijuana (§ 11362.765, subds. (a), (b)(3)). Accordingly, he argues the trial court breached its duty to give sua sponte instructions on any affirmative defense supported by the evidence. (See *People v. Salas, supra,* 37 Cal.4th at p. 982.) As Mentch misinterprets the scope and effect of the Program, we conclude the trial court committed no error in failing to instruct on any defense arising from it.

The Program was passed in part to address issues not included in the Act, so as to promote the fair and orderly implementation of the Act and to "[c]larify the scope of the application of the [A]ct." (Stats. 2003, ch. 875, § 1; see *People v. Wright* (2006) 40 Cal.4th 81, 93 [51 Cal.Rptr.3d 80, 146 P.3d 531].) As part of its effort to clarify and smooth implementation of the Act, the Program immunizes from prosecution a range of conduct ancillary to the provision of medical marijuana to qualified patients. (§ 11362.765.)

Having closely analyzed the text of section 11362.765, however, we conclude it does not do what Mentch says it does. While the Program does convey additional immunities against cultivation and possession for sale charges to specific groups of people, it does so only for specific actions; it does not provide globally that the specified groups of people may never be charged with cultivation or possession for sale. That is, the immunities conveyed by section 11362.765 have three defining characteristics: (1) they each apply only to a specific group of people; (2) they each apply only to a specific range of conduct; and (3) they each apply only against a specific set of laws. Subdivision (a) provides in relevant part: "Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be

subject, *on that sole basis*, to criminal liability under [enumerated sections of the Health and Safety Code]." (§ 11362.765, subd. (a), italics added.) Thus, subdivision (b) identifies both the groups of people who are to receive immunity and the "sole basis," the range of their conduct, to which the immunity applies, while subdivision (a) identifies the statutory provisions against which the specified people and conduct are granted immunity.

For example, subdivision (b)(1) grants immunity to a "qualified patient or a person with [a Program] identification card" who "transports or processes marijuana for his or her own personal medical use." (§ 11362.765, subd. (b)(1).) As we explained in *People v. Wright, supra,* 40 Cal.4th 81, this means a specified group—qualified patients and Program identification card holders—may not be prosecuted under particular state laws for specific conduct—transportation or processing for personal use—that otherwise might have been criminal. (*Id.* at p. 94; see *id.* at p. 92 [recognizing that the Program supersedes statement in *People v. Young* (2001) 92 Cal.App.4th 229, 237 [111 Cal.Rptr.2d 726], that the Act does not immunize marijuana transportation].)

The same is true of subdivision (b)(2) of section 11362.765, which likewise extends to a specific group—primary caregivers—state immunity for particular conduct—transportation, processing, administration, delivery, or donation—that might otherwise fall afoul of state law. (See *People v. Trippet, supra,* 56 Cal.App.4th at p. 1550 [acknowledging that the plain language of the Act, if literally applied, might fail to protect primary caregivers transporting marijuana down a hallway to their patients].)[10]

Finally, as relevant here, subdivision (b)(3) of section 11362.765 grants immunity to a specific group of individuals—those who assist in administering medical marijuana or acquiring the skills necessary to cultivate it—for specific conduct, namely, assistance in the administration of, or teaching how to cultivate, medical marijuana.[11] This immunity is significant; in its absence, those who assist patients or primary caregivers in learning how to cultivate marijuana might themselves be open to prosecution for cultivation. (§ 11358.)

---

[10] Section 11362.765, subdivision (b)(2) incorporates the quantitative limits of section 11362.77 in defining the scope of the immunity it provides. The constitutionality of those limits is not before us here, and we express no opinion on them. (See *People v. Kelly*, review granted Aug. 13, 2008, S164830.)

[11] Section 11362.765, subdivision (b)(3) extends the statutory immunities of subdivision (a) of that section to "[a]ny individual who provides assistance to a qualified patient or a person with [a Program] identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."

Here, this means Mentch, to the extent he assisted in administering, or advised or counseled in the administration or cultivation of, medical marijuana, could not be charged with cultivation or possession for sale "on that sole basis." (§ 11362.765, subd. (a).) It does not mean Mentch could not be charged with cultivation or possession for sale on *any* basis; to the extent he went beyond the immunized range of conduct, i.e., administration, advice, and counseling, he would, once again, subject himself to the full force of the criminal law. As it is undisputed Mentch did much more than administer, advise, and counsel, the Program provides him no defense, and the trial court did not err in failing to instruct on it.[12]

### DISPOSITION

For the foregoing reasons, we reverse the Court of Appeal's judgment.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**CHIN, J.,** Concurring.—I entirely agree with, and have signed, the majority opinion. I write separately to underscore the importance of an issue that we asked the parties to brief but that, due to our holding on the merits of the compassionate use defense, we do not have to decide in this case.

In *People v. Mower* (2002) 28 Cal.4th 457 [122 Cal.Rptr.2d 326, 49 P.3d 1067], we held that the defendant has the burden to raise a reasonable doubt regarding the compassionate use defense. As the majority opinion notes, the trial court instructed the jury on the compassionate use defense by modifying the standard CALJIC instruction. The instruction included this statement: " 'To establish the defense of compassionate use, the burden is upon the defendant to raise a reasonable doubt as to guilt . . . .' " (CALJIC No. 12.24.1 (2004 rev.) (7th ed. 2003), quoted in maj. opn., *ante*, at pp. 281–282, fn. 4.) The standard CALCRIM instruction, by contrast, does not place any burden whatever on the defendant. Instead, it states, "The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or transport marijuana for medical purposes. If the People have not

---

[12] In our grant of review, we asked the parties to brief whether a defendant's burden to raise a reasonable doubt regarding the compassionate use defense (see *People v. Mower, supra*, 28 Cal.4th at p. 477) is a burden of production under Evidence Code section 110 or a burden of persuasion under Evidence Code section 115. We also asked the parties to address whether the trial court should instruct the jury on a defendant's burden and, if so, how. (Compare CALJIC No. 12.24.1 (2004 rev.) (7th ed. 2003) with CALCRIM No. 2370 (2008).) Because Mentch has failed to show he was entitled to a primary caregiver instruction, error—if any—in describing Mentch's burden in this case would have been harmless, so we need not and do not resolve these issues.

met this burden, you must find the defendant not guilty of this crime." (Judicial Council of Cal., Crim. Jury Instns. (2008) CALCRIM No. 2363.)

Aware of the difference between the two standard instructions, and concerned about whether the trial court properly instructed the jury in this case, we directed the parties "to brief the additional question whether the defendant's burden to raise a reasonable doubt regarding the compassionate use defense (see *People v. Mower*[, *supra*,] 28 Cal.4th 457) is a burden of producing evidence under Evidence Code section 110 or a burden of proof under Evidence Code section 115. (See, e.g., Evid. Code, §§ 500, 501, 502, 550, and the Law Revision Commission Comments thereto; see also Pen. Code, § 189.5 and cases interpreting it, including *People v. Deloney* (1953) 41 Cal.2d 832, 841–842 [264 P.2d 532], *People v. Cornett* (1948) 33 Cal.2d 33, 42 [198 P.2d 877], and *People v. Loggins* (1972) 23 Cal.App.3d 597 [100 Cal.Rptr. 528]; and *People v. Frazier* (2005) 128 Cal.App.4th 807, 816–822 [27 Cal.Rptr.3d 336].) In this regard, the parties should also discuss whether the trial court should instruct the jury on the defendant's burden to raise a reasonable doubt and, if so, how. (Compare CALJIC No. 12.24.1 (2005 Revision) with . . . CALCRIM No. 2363.)"

The parties have briefed the question and agree on the answer. They agree that the defendant's burden is only to produce evidence under Evidence Code section 110, and that once the trial court finds the defendant has presented sufficient evidence to warrant an instruction on the defense, the defendant has fully satisfied this burden; accordingly, the court should not instruct the jury on any defense burden. (While generally agreeing that the standard CALCRIM instruction is correct in this regard, the Attorney General does suggest one modification of that instruction.)

If the parties' answer to our question is correct, CALJIC No. 12.24.1 misinstructs the jury. The Attorney General argues that any error in this case was harmless beyond a reasonable doubt for two reasons: (1) error in requiring defendant to raise a reasonable doubt as to a defense is inherently harmless in light of the instructions as a whole, which make clear to the jury that the prosecution has the overall burden of proof beyond a reasonable doubt; and (2) defendant simply did not establish the compassionate use defense. The majority concludes that any error in this regard was harmless because defendant "has failed to show he was entitled to a primary caregiver instruction . . . ." (Maj. opn., *ante*, at p. 292, fn. 12.) I agree and thus further agree that we need not now decide the question regarding the nature of defendant's burden to raise a reasonable doubt. (*Ibid.*)

Nevertheless, the question remains important. As the Attorney General notes in arguing that a defendant's burden is only to produce evidence under Evidence Code section 110, and that the court should not instruct the jury on this burden, "An instruction on the defendant's burden of production may run risks that are best avoided." Accordingly, the question needs to be resolved, preferably sooner rather than later. In the meantime, trial courts might well be advised to be cautious before instructing on any defense burden.

Corrigan, J., concurred.

On December 17, 2008, the opinion was modified to read as printed above.