Filed 9/28/15  P. v. Rose CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| THE PEOPLE, | C076696 |
| Plaintiff and Respondent, | (Super. Ct. No. P12CRF0649) |
| v. | |
| WILLY MORRISON ROSE, | |
| Defendant and Appellant. | |

A jury found defendant Willy Morrison Rose guilty of cultivation of marijuana, possession of concentrated cannabis, transportation of marijuana, and two counts of possession of marijuana for sale.  The jury also found defendant guilty of driving under the influence, a misdemeanor.  The jury found an on-bail allegation to be true but did not find an arming allegation in connection with one possession count to be true.

The court suspended imposition of sentence and granted probation subject to certain terms and conditions including 180 days in jail and the payment of fees and fines including the costs of the probation report and supervision.

1

Defendant appeals. He contends the trial court erred in instructing the jury with respect to the Compassionate Use Act of 1996[1] (Use Act) and in failing to instruct on the Medical Marijuana Program Act[2] (Program Act). We find no instructional error. Defendant also contends that the trial court erroneously imposed costs for the probation report and supervision without a finding of an ability to pay. We conclude that defendant has forfeited this claim by failing to object below. We also reject his due process claim.

FACTS

About 2:25 p.m. on November 28, 2012, Sheriff's Detective Jonathan Densmore responded to a report that defendant had smashed the window on the victim's SUV and had fled in a pickup truck. After seeing the damage and obtaining the victim's signature on an arrest form, Detective Densmore drove toward what he thought was defendant's residence at 3198 Buckeye Court (Buckeye property) in Placerville.

At the entrance to Buckeye Court, Detective Densmore saw defendant behind the wheel of the pickup truck and blocked his path. Defendant raised his hands and complied with the detective's orders. Defendant denied having been at the victim's house, providing an alibi but not enough information in order for the detective to confirm it. The detective arrested defendant. Detective Densmore noticed a strong odor of marijuana on defendant's person and asked if he had anything illegal on his person. Defendant admitted having some "pot." Detective Densmore searched defendant and found a large sum of cash, primarily $20 bills, in one of his pockets. Defendant said he did "yard work on and off" and thought there was about $1,000. When the detective commented that it was a lot of money for occasional yard work, defendant replied, " 'Prop. 215 marijuana makes money.' "

---

[1]     Health and Safety Code section 11362.5 et seq. Further references to undesignated sections are to this code.

[2]     Section 11362.7 et seq.

2

Defendant consented to a search of the pickup truck. Detective Densmore noticed a strong odor of marijuana inside the truck and there were remnants of marijuana stock, stems, leaves, and flowers. In the glove box, the detective found a one-gallon plastic baggie containing concentrated cannabis--the baggie was half full. In the truck bed, the detective found remnants of marijuana underneath a mattress which was dry even though it had rained earlier in that day. The detective believed the truck had been used to transport marijuana. Based on the items found, the amount of money, and defendant's statements, the detective believed that defendant was growing and selling marijuana for a profit.

The detective contacted the narcotics unit and several detectives responded. Later, they along with defendant went to a property located on One Eye Creek Road (Creek property) to look for evidence of cultivation. They found an empty trailer which had an odor of marijuana inside.

When interviewed, defendant admitted he had been growing 40 to 50 plants at the Creek property. Defendant hoped the plants would yield 100 pounds but thought the plants would yield only 20 pounds. Defendant explained the plants had been harvested just days before and hung in a trailer. Defendant admitted personal use of about four ounces of marijuana every month or about three pounds a year. At first, defendant admitted selling the remainder to "other marijuana recommendation holders" as well as to dispensaries. From the most recent crop (but not from the Creek property), he had sold 10 pounds for $8,000, which he later modified to $9,500. Defendant admitted giving a portion of the money from the sales to his father Jerry Stephen Rose (a codefendant) but did not say it was for expenses.[3] Defendant admitted the cash in his pocket was from the sale of marijuana but changed that statement and claimed the money was from Jerry.

---

[3]    Because defendant and his father share the same surname, we refer to defendant's father by his first name to avoid confusion.

With respect to the concentrated cannabis, he admitted he planned to sell it in the near future.

When interviewed at the Buckeye property, Jerry stated he used marijuana for medical problems. He admitted that 32 marijuana plants had been grown at the Buckeye property that year and that 16 plants belonged to him. Each plant yielded four ounces for a total of 64 ounces or four pounds. Jerry denied knowing about the marijuana grow at the Creek property. Jerry eventually admitted there was marijuana in a shed on the Buckeye property.

A search warrant was obtained. Jerry then admitted that he had been to the Creek property a few days before. At first, he admitted he had participated in taking marijuana to dispensaries in Colfax but then denied doing so and claimed defendant went. Jerry explained that defendant was "selling the marijuana at marijuana dispensaries," sharing the money with him from the sale of 10 pounds (about $2,500) to pay the bills, and to give him some of the proceeds. Jerry claimed that defendant "had sold" 10 pounds that year (2012) and 10 pounds the prior year (2011).

Jerry was unemployed and had no source of income since his business had closed in about 2010. Defendant and Jerry's daughter helped Jerry with expenses.

A search of Jerry's bedroom revealed sandwich bags and a container of marijuana and seeds with different strains and weights marked on them; ammunition to a nine-millimeter handgun; loaded and unloaded magazines for a Glock handgun; a loaded Glock handgun; a digital scale; $6,000 in cash in various locations; and documents including a bill from a well drilling company to defendant at the Buckeye property but concerning the Creek property dated May 2 and 10, 2012.

A search of defendant's bedroom revealed: three cell phones; baggies containing a small amount of marijuana; and indicia with defendant's name.

As previously mentioned, inside a shed on the Buckeye property, detectives found marijuana, specifically, a large black garbage bag with eight large Ziploc freezer bags

4

containing fresh marijuana bud totaling 9.8 pounds or 4,505 grams; 59 bags with marijuana residue labeled with different strains and a weight of 114 grams or one-quarter pound; a brown paper bag containing packaged marijuana bud; and some metal lines commonly used to hang and dry marijuana. Shake used in cooking was not found at the Buckeye property.

Detective Daniel Rath explained that the well drilling bill was significant because a lot of water is used to cultivate marijuana outdoors. He stated the Creek property was a prime location because it was in a rural area, surrounded by trees, and lacked traffic. Based on the items found, Detective Rath was of the opinion that the marijuana was possessed for commercial distribution rather than personal use.

About 2:45 p.m. on January 30, 2013, California Highway Patrol (CHP) Officer David Rodgers saw a pickup truck traveling down the right hand shoulder of an on-ramp to Highway 50. The pickup truck swerved back into its lane and then traveled several feet on the shoulder of the slow lane of the highway. The officer stopped the truck. Defendant was the driver. The officer detected the odor of marijuana from inside the truck cab and on defendant's breath and person. Defendant's eyes were red and watery. Defendant admitted having smoked marijuana an hour earlier. At first, he said he had smoked a blunt but changed his statement to just one hit from the blunt. Defendant claimed he was going on a business trip but then stated he was unemployed and headed to the grocery store. He denied feeling the effects of smoking marijuana. Defendant's tongue was green, his pulse was rapid and his pupils were dilated, and he could not converge his eyes, did not complete a balance test, and had eyelid tremors. CHP Officer Ronald Ellison, a drug recognition evaluator, conducted an evaluation of defendant and was of the opinion that defendant was under the influence of marijuana and was unable to drive safely. Officer Rodgers concurred with Officer Ellison's opinion. After arresting defendant, Officer Rodgers searched the pickup truck which revealed five bags of marijuana behind the bench seat. Inside one of the bags, the officer found a physician's

5

recommendation for medical use of marijuana valid through December 11, 2013. The marijuana had a net weight of 360.9 grams. Defendant claimed he smoked two or three grams a day for "psychological reasons." Defendant admitted that he had been arrested a month earlier for possession for sale. He claimed he "makes a donation of marijuana to marijuana dispensaries, and in return the dispensary donates him money," and explained he was taking the five bags to a dispensary to donate. When the officer asked which dispensary, defendant refused to identify it by name or location and refused to state how often he donated. Based on the marijuana recovered, the packaging, the number of bags and defendant's statement of "donation" for money, Officer Rodgers was of the opinion that defendant possessed the marijuana for sale.

In April 2013, Detective Eric Palmberg investigated two dispensaries in the Cameron Park area that resulted in the arrests of individuals running the dispensaries and seizure of various items. From the "C4C" dispensary, the detective found four contribution forms with defendant's name and phone numbers, reflecting defendant sold marijuana to the dispensary on December 12, 18, and 28, 2012 and on January 11, 2013 for $120, $75, $200, and $100, respectively.

The 21-year-old defendant testified that he suffered from chronic pain and psychological problems and claimed he obtained a medical marijuana recommendation in 2011 and continuously since then. He had been living with Jerry but moved out about a month before November 28, 2012, because of his alcohol problems and behavior and lived in the trailer on the Creek property. Defendant explained that Doug Lancaster owned the Creek property. Lancaster paid defendant $500 to plant and grow medical marijuana for Lancaster. Defendant harvested three pounds for Lancaster. Defendant claimed he lied to detectives when he said: marijuana in the trailer at the Creek property belonged to him; he sold 10 pounds of marijuana; he received $7,000 from selling marijuana most of which went to Jerry; and he intended to sell the concentrated cannabis found in his pickup truck. He also claimed he was Jerry's caregiver as well as

6

Lancaster's. The $1,000 found on his person in November 2012 came from growing marijuana at the Creek property, which he considered yard work. Defendant also said the money was his "caregiver" money. Two to three pounds of the marijuana found in the shed on the Buckeye property in November 2012 belonged to him. After his arrest in November, he lived in his truck and "donated" marijuana to C4C cooperative in exchange for money on which he lived. In January 2013, the marijuana found in his truck was his "marijuana medicine," which he grew at the Buckeye property.

Jerry testified and denied that defendant was selling marijuana for him; Jerry claimed the 10 pounds of marijuana found at the Buckeye property was his 10-month supply grown at the Buckeye property. He used a pound per month. Jerry claimed he was a member of a cannabis club in Colfax. Jerry hired defendant to be a caregiver for Jerry and Lancaster. At the Buckeye property, 16 plants belonged to Jerry and 16 plants belonged to defendant. Jerry knew defendant was growing marijuana at the Creek property. Both the Buckeye and Creek properties were harvested in October 2012. Jerry claimed defendant was not selling marijuana but "only donated to clubs in a legal way."

In rebuttal, Detective Palmberg testified that defendant stated he had about 50 marijuana plants at the Creek property, which he cut and hung; he sold marijuana to dispensaries and other valid medical marijuana recommendation holders; he received $8,000 and then later said $9,500 in exchange; he sold marijuana for Jerry whose share was $7,000; and he intended to sell the concentrated cannabis found in his truck. Detective Palmberg testified that Jerry stated: defendant was supposed to be selling the excess marijuana; Jerry thought defendant had sold 10 pounds to a club the year before; and Jerry's cut was $2,500.

## DISCUSSION

Defendant acknowledges that the trial court instructed on the Use Act on some counts but contends the trial court erred in failing to instruct sua sponte on the possession for sale counts. He also contends the Use Act instruction that was given was deficient for

7

failing to include language allowed by the Program Act regarding collectives and cooperatives. Defendant also challenges the Use Act language, arguing it erroneously limited the amount of marijuana to that "reasonably related" to his current medical needs and failed to instruct that it applies to a supplier of marijuana to a collective or cooperative.

We conclude that the trial court properly instructed on the Use Act and had no duty to instruct on the collective cultivation defense (Program Act) since defendant was not relying on the Program Act. Further, we conclude there was insufficient evidence to support a Program Act instruction.

I

*The Jury Instructions*

With respect to cultivation, the trial court instructed the jury in the language of CALCRIM No. 2370, in relevant part, as follows:

"The Defendant, Willy Rose, is charged in Count I with unlawfully planting or cultivating or harvesting or drying or processing marijuana, a controlled substance, in violation of Health and Safety Code Section 11358. To prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant unlawfully planted or cultivated or harvested or dried or processed one or more marijuana plants; and, two, the Defendant knew that the substance he planted or cultivated or harvested or dried or processed was marijuana.

"[¶] . . . [¶]

"Possession or cultivation of marijuana is lawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows a person to possess or cultivate marijuana for personal medical purposes or as a primary caregiver of a patient with a medical need when a physician has recommended or approved such use.

"The amount of marijuana . . . possessed or cultivated must be reasonably related to the patient's current medical needs.

8

"The People have the burden of proving beyond a reasonable doubt the Defendant was not authorized to possess or cultivate marijuana for medical purposes. If the People have not met this burden, you must find the Defendant not guilty of this crime.

"A primary caregiver is someone who has consistently assumed responsibility for the housing, health, or safety of a patient who may legally possess or cultivate marijuana."

With respect to possession of concentrated cannabis and transportation of marijuana, the trial court instructed the jury in the language of CALCRIM Nos. 2377 and 2361 on the elements of the offenses and included similar Use Act language as used in the instruction on cultivation. The trial court did not include the Use Act language in the instruction on possession of marijuana for sale (CALCRIM No. 2352) but did reference the Use Act language (incorporating by reference the Use Act language used in CALCRIM Nos. 2370, 2377, and 2361) in the instruction on possession of 28.5 grams or more, a lesser possession of marijuana for sale. Defendant's attorney did not request Program Act language and had no objection to any of the foregoing instructions.

In arguing to the jury, defendant's attorney relied on the Use Act and argued defendant possessed or cultivated only that amount reasonably related to his personal medical needs. Defendant's attorney did not argue for a collective cultivation defense.

In 1996, California voters approved Proposition 215, the Use Act. The Use Act grants only "a limited immunity from prosecution." (See *People v. Mower* (2002) 28 Cal.4th 457, 470.) "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) "[T]he quantity possessed by the patient or the primary caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs." (*People v. Trippet* (1997)

9

56 Cal.App.4th 1532, 1549; *People v. Kelly* (2010) 47 Cal.4th 1008, 1049 [citing *Trippet's* construction of the language "personal medical purposes of the patient"].)  The Use Act provides a limited defense to specified crimes, "not a constitutional right to obtain marijuana."  (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 774.)  As a "limited affirmative defense, the burden is . . . on the defendant to raise the defense and prove its elements" (*Trippet*, at p. 1551, fn. 17, cited with approval in *People v. Wright* (2006) 40 Cal.4th 81, 96) by raising a reasonable doubt as to whether the elements of the defense has been proven.  (*People v. Mower*, at pp. 477, 481, 483.)

In 2003, the Program Act was passed by the Legislature to clarify the scope of the Use Act and to promote uniform application of it among the counties.  (Stats. 2003, ch. 875, § 1.)  The Program Act created a voluntary program for the issuance of identification cards to qualified patients and primary caregivers.  (§ 11362.71.)  The Program Act "immunizes from prosecution a range of conduct ancillary to the provision of medical marijuana to qualified patients."  (*People v. Mentch* (2008) 45 Cal.4th 274, 290.)  Section 11362.765, subdivision (a) provides that specified individuals "shall not be subject, on that sole basis, to criminal liability" under sections 11357 [possession], 11358 [cultivation], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining location for selling, giving away or using controlled substances], 11366.5 [managing location for manufacture or storage of controlled substance], or 11570 [nuisance abatement of certain buildings].  "However, nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana *for profit*."  (§ 11362.765, subd. (a), italics added.)  This immunity extends to qualified patients, primary caregivers, and holders of valid identification cards "who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes." (§ 11362.775.)  The Program Act does not, however, "confer on qualified patients and their caregivers the unfettered right to cultivate or dispense marijuana anywhere they choose."  (*County of Los Angeles v. Hill* (2011) 192 Cal.App.4th 861, 869.)  Section

10

11362.765 does not mean a defendant cannot "be charged with cultivation or possession for sale on *any* basis; to the extent he went beyond the immunized range of conduct, . . . he would, once again, subject himself to the full force of the criminal law." (See *People v. Mentch*, *supra*, 45 Cal.4th at p. 292.)

"The MMPA provides a defense when a defendant shows that members of the collective or cooperative: '(1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise.' " (*People v. Baniani* (2014) 229 Cal.App.4th 45, 59.)

Defendant's arguments in this case reflect that he misapprehends the Use Act and Program Act. Defendant was not entitled to instructions on the Program Act defense because he relied on the Use Act defense and never indicated that he was relying on the Program Act defense. Defendant's attorney did not request Program Act language. In arguing to the jury, defendant's attorney relied on the Use Act and argued defendant possessed or cultivated only that amount reasonably related to his personal medical needs.

Moreover, defendant failed to present evidence in support of the Program Act defense. With respect to defendant's claims of being a "supplier" of marijuana to a collective, the Program Act allows a qualified patient or primary caregiver to do so if the patient or caregiver is a member of the cooperative or collective and does so on a nonprofit basis. (*People v. Anderson* (2015) 232 Cal.App.4th 1259, 1277-1278.)

There was no evidence that defendant was a member or any evidence he claimed membership in or joined a cooperative or collective. He never identified or described a collective of which he claimed membership, just a dispensary to which he "donated" marijuana in exchange for a "donation" of money. Moreover, there was not any evidence that a collective or cooperative association existed. (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 271-272; *People v. Anderson*, *supra*, 232 Cal.App.4th at pp. 1280-

11

1282; *People v. London* (2014) 228 Cal.App.4th 544, 566; *People v. Solis* (2013) 217 Cal.App.4th 51, 57-58.)  The trial court had no duty to instruct sua sponte on the collective cultivation defense.

With respect to defendant's claim the Use Act instruction was not given on the possession for sale offenses, the trial court did not err.  The Use Act does not apply to possession *for sale* and, as previously discussed, there was insufficient evidence that defendant's sales were within the Program Act, contrary to defendant's claim, since he was not a member of a collective.

With respect to defendant's claim the Use Act instruction incorrectly limited the quantity of marijuana, the Use Act, as interpreted by case law (*People v. Trippet*, *supra*, 56 Cal.App.4th at p. 1549; *People v. Kelly*, *supra*, 47 Cal.4th at p. 1049), limits the amount that reasonably related to the patient's current medical needs.  We believe *Kelly* endorsed *Trippet*'s definition; in any event, we will continue to follow *Trippet*. (See *People v. Frazier* (2005) 128 Cal.App.4th 807, 824-825.)  We reject defendant's contention that the trial court erred in instructing the jury accordingly.

With respect to defendant's claim that the "reasonably related" requirement does not apply to the Program Act, we need not consider it since defendant was not entitled to an instruction on the Program Act defense.  Having found no instructional error, we do not reach his claim of a violation of his constitutional rights or his claim of prejudice.

II

*Costs Of Probation Report And Supervision*

In imposing the cost of preparing the probation report ($460) and the cost of probation supervision ($250), the trial court did not find that defendant had the ability to pay these probation-related costs set forth in Penal Code section 1203.1b.  Defendant contends the probation-related costs must be stricken because he was entitled to a judicial determination of his ability to pay which he did not waive and which the trial court did not make.

12

After defendant filed his opening brief, the Supreme Court decided *People v. Trujillo* (2015) 60 Cal.4th 850 and extended the scope of the forfeiture rule announced in *People v. McCullough* (2013) 56 Cal.4th 589 to the very issue defendant raises on appeal. *Trujillo* concluded that a defendant must assert noncompliance with Penal Code section 1203.1b in the trial court in order to challenge the probation-related costs on appeal. (*Trujillo*, at pp. 858-860.)  Defendant failed to do so here.  His challenge for the first time on appeal is forfeited as is his due process claim.  We note that defendant is not left without recourse.  As *Trujillo* noted, a defendant may petition the trial court for a review on grounds of a change in circumstances in his ability to pay.  (*Trujillo*, at pp. 860-861; Pen. Code, § 1203.1b, subd. (f).)

DISPOSITION

The judgment is affirmed.


                                                                         ROBIE               , J.

We concur:


BLEASE , Acting P. J.


MURRAY , J.

13