[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 300 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 301 
OPINION
A jury found appellant Nathaniel Archer guilty of cultivation of marijuana in violation of Health and Safety[1]
Code section 11358, a felony (count 1), and of simple possession of marijuana in violation of section 11357, subdivision (a) (as a lesser included offense of count 2).[2]
Archer waived a jury trial on a prior conviction, and the trial court made a true finding he was convicted of a "strike" prior in 1986 (Pen. Code, §§ 667, subds. (b)-(i), 1170.12). At sentencing, the court struck the 22-year-old strike prior under Penal Code section 1385, placed Archer on formal probation for three years and ordered him to pay various fines and fees.
On appeal, the parties agree the trial court erred when it included the numerical limits set forth in section 11362.77, subdivision (a) of the Medical Marijuana Program Act (MMPA) in instructing the jury regarding the amount of medical marijuana that Archer could lawfully possess and/or cultivate because this section unlawfully amends the Compassionate Use Act of 1996 (§ 11362.5) (CUA) passed by voters in 1996 as Proposition 215. The parties disagree, however, whether that error was harmless.
Archer contends that because he possessed and/or cultivated an amount of marijuana in excess of the numerical limits set forth in section 11362.77, subdivision (a), his convictions were a fait accompli and were not based on a determination of the medical marijuana needs of Archer and at least two of his "patients" who had designated him as their "primary caregiver" within the meaning of section 11362.5, subdivision (e).
The People argue that because Archer admitted he was growing marijuana for at least four other people in addition to himself, and because as a matter of law he does not qualify as a primary caregiver for the only two qualified patients he identified at trial, the instructional error was harmless beyond a reasonable doubt.
Assuming arguendo section 11362.77 is unconstitutional, we agree with the People that the instructional error was harmless in connection with Archer's conviction for cultivating marijuana in violation of section 11358. Archer admitted he was growing marijuana for at least four other people and he proffered no evidence to show he was the primary caregiver for any of them, including the two who testified on his behalf at trial. It was thus unlawful for Archer to grow any
amount of marijuana for others. *Page 303 
However, in connection with his conviction for simple possession under section 11357, subdivision (a), we conclude the instructional error — capping the amount of marijuana Archer could lawfully possess — was prejudicial. Archer himself was a qualified patient in April 2006. As such, he was entitled to possess an amount of marijuana reasonably related to his own medical needs. (See § 11362.5, subd. (d).) Unlike his cultivation of marijuana, the record is silent regarding whether the 1.72 pounds of dried marijuana Archer possessed was for his own personal medical needs, as opposed to the needs of others. Because Archer testified he was using about a half-pound of marijuana each month in the April 2006 timeframe, we conclude it was for the jury to decide whether the 1.72 pounds of marijuana he then possessed was reasonably related to his then own medical needs. We thus reverse Archer's conviction for simple possession.
 FACTUAL AND PROCEDURAL BACKGROUND
A. Prosecution Evidence
In early April 2006, Archer's mother and her husband went to a home she owned where Archer had lived since 1991. Because Archer was in the process of moving and was not at home, Archer's mother and her husband let themselves into the house. They discovered Archer was growing marijuana and called the police.
Police entered the house and discovered 98 marijuana plants growing in Archer's bedroom. Police also found business cards in the house that said "Medi Clone." A medical symbol and a marijuana leaf appeared on the cards, along with two phone numbers and an e-mail address. Police also found a second business card, similar to the first but in color, with two names, Nathan and Ryan. The bedroom was set up to create an environment conducive to growing marijuana, including black plastic over the windows, special duct-work and hooks for hanging grow lights, among other equipment.
Police found jars in the kitchen containing dried marijuana leaves and residue from marijuana. Police found 780 grams, or 1.72 pounds, of marijuana in the jars. Police also found items in the garage used to grow marijuana, including electrical cords, about 100 pots that ostensibly were used to grow marijuana and ballasts for lights. There were also marijuana leaves scattered on the floor. On the wall of the garage police found a document indicating the resident was a medical marijuana caregiver, but the document did not include any specific identifying information. *Page 304 
B. Defense Evidence
1. Witness Testimony
Rodolfo Reyes and Scott Olson testified at Archer's trial. Reyes, a burn victim, testified that in 2003 he was burnt over 65 to 80 percent of his body. Under the supervision of his doctors, he began to use marijuana and its prescription version, Marinol, in lieu of traditional painkillers such as morphine, to reduce the myriad side effects he suffered from taking painkillers and after his body rejected morphine. Reyes had a recommendation for medical marijuana from Dr. Robert Sterner for the period September 20, 2005, through September 21, 2006.
When he got out of the hospital, Reyes testified, he tried to grow his own marijuana. He eventually stopped because he could not tolerate being in the sun. He later grew plants indoors, but they were confiscated by police.
In April 2006 Reyes was using marijuana from a dispensary that has since closed. While in the dispensary, Reyes was told about Archer and his knowledge of growing marijuana plants correctly. Using a primary caregiver designation form provided by Dr. Sterner, Reyes designated Archer as his primary caregiver in either summer 2004 or 2005. Reyes testified that, as his caregiver, Archer had the right to maintain marijuana plants for Reyes for a one-year period. Reyes never received any marijuana from Archer, however.
In April 2006 Reyes testified he was using at least a pound of marijuana a month. He obtained his marijuana from medical marijuana dispensaries. He primarily used the marijuana topically, by "juicing" it and adding it to burn cream, which he applied on his body twice a day to relieve the constant pain and itching. He also inhaled and ingested the marijuana.
Scott Olson testified he was involved in a serious motorcycle accident in 1998. He suffered numerous broken bones and internal injuries, and remained hospitalized for three weeks. Doctors prescribed Olson numerous painkillers, muscle relaxants and antidepressants. These drugs made Olson irritable and nauseous. In addition, Olson worried about the long-term effects of taking such medications.
Olson turned to alternative medicines and therapies to treat his pain. Eventually, in 2002 or 2003 Olson's primary care physician suggested he try Marinol and/or marijuana. Olson testified the Marinol did not help him, but as he began to reduce the narcotics he was taking, he found using marijuana helpful for his pain. *Page 305 
Olson acquired a recommendation for medical marijuana use from Dr. Sterner. Olson initially obtained marijuana from dispensaries. In April 2006 Olson testified he was using about six to eight ounces of marijuana, and spending about $600, monthly. Because his out-of-pocket costs were not covered by insurance, Olson decided to start his own marijuana garden. While at a dispensary, Olson was given Archer's name as somebody that might be able to help him grow marijuana and provide him with plants.
Olson contacted Archer in early April 2006. After face-to-face meetings, Olson designated Archer as his primary caregiver. Although Archer never provided Olson with any dried marijuana, Archer gave Olson "[s]mall cuttings from mature female plants" so Olson could start his own garden. Olson testified Archer did not charge him for the plant cuttings. However, Olson did pay Archer $35 or $40 as a consultant for Archer's advice on how to grow the plants.
After the first set of marijuana plants from Archer died, Olson received a second set from Archer. From time to time Archer and Olson spoke about growing marijuana and whether the marijuana plants Archer had given Olson were helping Olson. However, Archer never went to Olson's house to check on Olson's health or safety. Olson testified that all he wanted from Archer was "plants and some assistance in learning how to grow them."
2. Archer's Testimony
Archer took the stand in his own defense. He testified he was in a construction accident in 1995 that damaged his leg. Archer took various medications for pain during healing and rehabilitation. However, he testified that through April 2006 he continued to suffer residual pain from the accident.
Because of side effects from the medications, Archer researched the use of marijuana as an alternative to conventional painkillers he was taking. In 2004 he started a small garden and obtained a doctor's recommendation for the use of medical marijuana.
Archer acknowledged Reyes and Olson designated him as their primary caregiver and admitted he was growing marijuana in April 2006 for five total individuals, including Reyes, Olson, himself and two other individuals he did not identify. Archer initially grew the marijuana in the garage of his house, but after the plants became infested with insects, he moved the operation into his bedroom. However, the second crop also became infested. Archer decided to abandon the house and the crop because the infestation meant he was "not *Page 306 
going to get any medication from [the plants] and neither [were] the patients that I'm supposed to be caregiving for at the time." Archer never provided any dried marijuana (e.g., "product") to Reyes and Olson because of the infestation. At the time his mother discovered the plants growing in the house, Archer was in the process of moving out.
Archer testified he did not have 98 plants, as the prosecution witnesses alleged. He claimed instead there were only 36 containers with baby clones, some of which had multiple shoots. Archer also did not really consider the baby clones to be actual plants because they were not mature and did not have roots.
Archer also testified that as of April 2006 he was consuming about one-half pound of marijuana every month. He testified he mostly ate marijuana, but also applied it topically and smoked it.
3. Expert Testimony
Christopher Conrad testified as an expert in marijuana growth and yields. He testified that consuming dried marijuana in food uses approximately four times more product than if the dried plant is inhaled by smoking.
Using the photographs of Archer's plants, Conrad testified they looked "pretty much dead" and appeared at least two to three months away from being mature enough for harvesting. He further testified that if the plants were healthy and grew to maturity, they could yield a pound to a pound and a half of useable marijuana, and that if everything was done perfectly, a grower could produce three such crops per year.
 DISCUSSION
Archer contends the trial court prejudicially erred when it instructed the jury regarding the numerical limitations of marijuana he could lawfully possess and/or cultivate. Consistent with the CUA (and portions of the MMPA), the trial court instructed the jury as follows in connection with both count 1 and the lesser included offense in count 2: "Possession of marijuana is lawful if authorized by the [CUA]. In order for the [CUA] to apply, the defense must produce evidence tending to show that his possession or cultivation of marijuana was for personal medical purposes, or as the primary caregiver of a patient with a medical need, when a physician has recommended or approved such use.[¶] The amount of marijuana possessed must be reasonably related to the patient's current medical needs. [¶] A qualified patient or primarycaregiver may possess no more than eight ounces of dried *Page 307 marijuana per qualified patient. In addition, aqualified patient or primary caregiver may also maintain nomore than six mature or 12 immature marijuana plants perqualified patient." (Italics added.)
Archer contends, and the People agree, it was error for the trial court to include the numerical limitations derived from section 11362.77, subdivision (a) of the MMPA (italicized portion) when instructing the jury because those limitations, which set the maximum amount of marijuana Archer could lawfully possess and/or cultivate, unconstitutionally amended the CUA passed by the voters. After Archer was convicted, two cases held that the quantity limitations set forth in section 11362.77, subdivision (a), unconstitutionally amend the CUA, which set no such limitations. This issue is currently pending before our Supreme Court. (See People v. Kelly, review granted Aug. 13, 2008, S164830; People v. Phomphakdy, review granted Oct. 28, 2008, S166565.)
A. Overview of the CUA and MMPA
Briefly, the voters approved the CUA (Prop. 215) in 1996, which is codified in section 11362.5. (People v. Trippet
(1997) 56 Cal.App.4th 1532, 1546 [66 Cal.Rptr.2d 559];People v. Tilehkooh (2003) 113 Cal.App.4th 1433, 1436
[7 Cal.Rptr.3d 226].) Subdivision (d) of section 11362.5 provides: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."[3]
The Legislature in 2003 passed the MMPA, effective January 1, 2004, adding sections 11362.7 through 11362.83 to the Health and Safety Code. (People v. Wright, supra,40 Cal.4th at p. 93.) The express intent of the Legislature was to; "(1) Clarify the scope of the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the [CUA] among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects, [¶] *Page 308 
(c) It is also the intent of the Legislature to address additional issues that were not included within the [CUA], and that must be resolved in order to promote the fair and orderly implementation of the [CUA]." (Stats. 2003, ch.875, § 1(b), (c).)
The MMPA, among other things, places a ceiling on the amount of marijuana that can be lawfully possessed by a qualified patient or primary caregiver. Section 11362.77, subdivision (a), states: "A qualified patient or primary caregiver may possessno more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient." (Italics added.) Subdivision (b) of that section states that "[i]f a qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs."
B. Constitutional Challenge
Article II, section 10, subdivision (c) of the California Constitution prohibits the Legislature from amending an initiative measure, such as the CUA at issue here, unless the initiative measure itself authorizes legislative amendment. (Cal. Const., art. II, § 10, subd. (c); People v.Cooper (2002) 27 Cal.4th 38, 44 [115 Cal.Rptr.2d 219,37 P.3d 403].) "An amendment is ` . . . any change of the scope or effect of an existing statute, whether by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent and original in form . . . [.]' [Citation.] A statute which adds to or takes away from an existing statute is considered an amendment." (Franchise Tax Bd. v. Cory (1978) 80 Cal.App.3d 772,776 [145 Cal.Rptr. 819]; see Knight v. Superior Court
(2005) 128 Cal.App.4th 14, 22 [26 Cal.Rptr.3d 687].)
The CUA does not authorize legislative amendment without voter approval. In addition, the numerical limits set forth in section 11362.77, subdivision (a) of the MMPA for possession and/or cultivation of marijuana by a qualified patient replaced the "personal medical purposes" standard in section 11362.5, subdivision (d), which case law has interpreted to mean a "reasonable amount." (See People v. Trippet, supra,56 Cal.App.4th at p. 1549.)
Assuming arguendo the MMPA's numerical limits unconstitutionally amended the CUA, as the parties contend, we conclude the numerical *Page 309 
limitation included in the erroneous jury instruction was harmless beyond a reasonable doubt in connection with count 1, for cultivation of marijuana, but prejudicial with respect to the lesser included offense in count 2, for simple possession of marijuana. (See People v. Flood (1998)18 Cal.4th 470, 502-503 [76 Cal.Rptr.2d 180, 957 P.2d 869] [misinstruction on an element of an offense must be examined under the standard of beyond a reasonable doubt as required by Chapman v.California (1967) 386 U.S. 18 [17 L.Ed.2d 705,87 S.Ct. 824]].)
C. Primary Caregiver
Under the CUA, a "primary caregiver" is defined as an "individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5, subd. (e).)
Our Supreme Court recently concluded that to be a primary caregiver within the meaning of section 11362.5, subdivision (e) of the CUA, an individual must show that "he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." (People v. Mentch (2008)45 Cal.4th 274, 283 [85 Cal.Rptr.3d 480, 195 P.3d 1061].) Because the appellant in Mentch failed to proffer sufficient evidence he was providing his patients consistent caregiving, independent of providing them marijuana, at or before he began providing them marijuana, the court held he was not entitled to a primary caregiver jury instruction. (Id. at pp. 288-289.) The Mentch court concluded that the appellant's testimony he "sporadically" took a couple of patients to medical appointments and provided shelter to one of his patients was insufficient to establish the primary caregiver defense under the CUA. (45 Cal.4th at pp. 288-289.)
The Mentch court noted the term "consistency" "suggests an ongoing relationship marked by regular and repeated actions over time." (People v. Mentch, supra,45 Cal.4th at p. 283.) The court further noted that primary caregiver status "requires an existing, established relationship. In some situations, the formation of a bona fide caregiving relationship and the onset of assistance in taking medical marijuana may be contemporaneous, as with a cancer patient entering chemotherapy who has a recommendation for medical marijuana use and has a live-in or home-visit nurse to assist with all aspects of his or her health care, including marijuana consumption. [Citation.] . . . [However,] [w]hat is not permitted is for an individual to establish an after-the-fact caregiving relationship in an effort to thereby immunize from prosecution previous cultivation or possession for sale." (Id. at p. 284.) *Page 310 
Finally, the court in People v. Mentch noted a primary caregiver "must establish he or she satisfies the responsibility clause [in section 11362.5, subdivision (e)] based on evidence independent of the administration of medical marijuana." (People v. Mentch, supra,45 Cal.4th at p. 284.) That is, under the CUA a "primary caregiver relationship is a necessary antecedent, a predicate for being permitted under state law to possess or cultivate medical marijuana." (Mentch, at p. 284.) Thus, the Mentch court agreed with previous decisions concluding consistent growth and supply of medical marijuana by itself is not
sufficient to establish the primary caregiver defense. (Id. at p. 285, citing People v. Frazier
(2005) 128 Cal.App.4th 807, 823 [27 Cal.Rptr.3d 336], andPeople v. Windus (2008) 165 Cal.App.4th 634, 644
[81 Cal.Rptr.3d 227] ["Case law is clear that one who merely supplies a patient with marijuana has no defense under the CUA."].)
The MMPA defines "primary caregiver" using the same definition as the CUA. (See § 11362.7, subd. (d).) "While the MMPA identifies certain individuals who can be valid primary caregivers, i.e., persons designated by more than one person, all of whom reside in the same city or county, the person (or entity) [designated as the primary caregiver] must still meet the requirement of `consistently' assuming responsibility for the housing, health or safety of that person." (People v.Hochanadel (2009) 176 Cal.App.4th 997, 1015-1016
[98 Cal.Rptr.3d 347], citing People v. Mentch, supra,45 Cal.4th at p. 283.)
D. Analysis
1. Count 1, Cultivation
Here, the record shows Archer admitted at trial he was growing marijuana for at least five people, including himself. Of the remaining four individuals, he identified only two of them, Rodolfo Reyes and Scott Olson, both of whom testified in April 2006 they were patients entitled to use medical marijuana who designated Archer as their "primary caregiver." The record is bereft of evidence showing Archer "assumed responsibility for the housing, health, or safety" of Reyes or Olson, or for the other two unidentified individuals he was cultivating marijuana for in April 2006, much less on a "consistent" basis. Indeed, Olson testified he designated Archer as his primary caregiver so that Archer could provide him with marijuana plants and advice on how to grow the marijuana. However, as noted, the growth and supply of medical marijuana by itself isnot sufficient to establish the primary caregiver defense. (People v. Mentch, supra,45 Cal.4th at p. 285; People v. Frazier, supra,128 Cal.App.4th at p. 823; People v. Windus, supra,165 Cal.App.4th at p. 644.) *Page 311 
The fact Archer was a qualified patient and growing marijuana for his own medical needs does not change our conclusion. The CUA permits cultivation by a patient for the patient's own use or for others by a primary caregiver. (§ 11362.5, subd. (d).) As the court in Mentch noted, the primary caregiver status provides a defense to possession or cultivation "only if it extended to all the marijuana [the alleged caregiver] possessed or cultivated." (People v.Mentch, supra, 45 Cal.4th at p. 289.)
As noted, Archer admitted he was growing marijuana for five people, three of whom he identified (himself, Reyes and Olson). However, unless Archer was the primary caregiver for the four other people, the CUA did not permit him to cultivate marijuana for them. (§ 11362.5, subd. (d).) Thus, even if we concluded Archer's status of primary caregiver applied to Reyes and Olson (assuming arguendo there was sufficient evidence to show he "consistently assumed responsibility for the housing, health, or safety" of Reyes and Olson), Archer would still not be entitled to this defense because he admitted growing marijuana for two other individuals, neither of whom he established as qualified patients who had designated him as their primary caregiver. Nor did Archer show he "consistently assumed responsibility for the housing, health, or safety" of these two other individuals. (See § 11362.5, subd. (e).)
Because Archer does not qualify as a "primary caregiver" within the meaning of the CUA, and because, in any event, he admitted growing marijuana for at least two other unidentified individuals, we conclude the trial court's inclusion of the numerical limit regarding the amount of marijuana Archer could cultivate in the CUA jury instruction was harmless beyond a reasonable doubt.[4]
2. Count 2, Possession
However, we reach a different conclusion with respect to his conviction for simple possession, a lesser included offense in count 2 (§ 11357, subd. (a)). Before the Legislature enacted section 11362.77 of the MMPA, the only relevant section as to how much marijuana a medical marijuana patient could possess (or cultivate) was section 11362.5. Therefore, assuming section 11362.77, subdivision (a), is unconstitutional, as the parties jointly contend, *Page 312 
the relevant law on the issue of the amount of marijuana Archer could possess would be section 11362.5 and the cases interpreting that statute.
Under section 11362.5, subdivision (d), the only qualification concerning the amount of marijuana that a medical marijuana patient could possess (or cultivate) was that the marijuana be for the "personal medical purposes" of the patient. (§ 11362.5, subd. (d).) As noted, courts have interpreted this qualification to mean a reasonable amount: "[T]he quantity possessed by the patient or the primary caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs. What precisely are the `patient's current medical needs' [is], of course . . . a factual question to be determined by the trier of fact." (People v. Trippet, supra,56 Cal.App.4th at p. 1549.[5])
Here, the evidence in the record shows Archer was using about a half-pound of medical marijuana each month as of April 2006, mostly by ingesting it, and that he possessed about 1.72 pounds of marijuana — or about a three-month supply of medical marijuana — when police entered his home and confiscated it and his plants. Unlike his conviction for cultivation of marijuana, however, there is no evidence Archer possessed the 1.72 pounds of marijuana for purposes other than for his own personal medical use. Because it is question of fact whether the amount of marijuana he possessed was "reasonably related" to Archer's then current medical needs, we conclude the trial court's error in instructing the jury regarding the numerical limitation set forth in section 11362.77 of the MMPA (e.g., eight ounces of dried marijuana per qualified patient) was prejudicial. *Page 313 
 DISPOSITION
The judgment of conviction for cultivation (§ 11358 [count 1]) is affirmed. The judgment of conviction for simple possession (§ 11357, subd. (a) [a lesser included offense of count 2]) is reversed.[6]
McConnell, P. J., and Nares, J., concurred.
[1] All further statutory references are to the Health and Safety Code unless otherwise specified.
[2] The jury found Archer not guilty of possession of marijuana for sale in violation of section 11359, a felony (count 2).
[3] The CUA does not apply, however, to the offenses of possession for sale (§ 11359) or furnishing marijuana (§ 11360). (See § 11362.5, subd. (d); see alsoPeople v. Wright (2006) 40 Cal.4th 81, 99
[51 Cal.Rptr.3d 80, 146 P.3d 531] [jury determination that marijuana was possessed for sale rather than personal use rendered failure to give instruction on CUA defense harmless with regard to charge of transportation of marijuana].)
[4] At oral argument before this court, Archer conceded that under People v. Mentch, supra, 45 Cal.4th at page 283, he did not qualify as a primary caregiver within the meaning of section 11362.5, subdivision (e).
[5] See also CALCRIM No. 2370, which includes the compassionate use defense and provides in part as follows:
"Defense: Compassionate Use
[P]ossession of marijuana is lawful if authorized by the Compassionate Use Act. In order for the Compassionate Use Act to apply, the defense must produce evidence tending to show that (his/her) possession or cultivation of marijuana was (for personal medical purposes/[or] as the primary caregiver of a patient with a medical need) with a physician's recommendation or approval. The amount of marijuana possessed must bereasonably related to the patient's current medical needs.
If you have a reasonable doubt about whether the defendant's possession or cultivation of marijuana was unlawful under the Compassionate Use Act, you must find the defendant not guilty. [11 [A primary caregiver is someone who has consistently assumed responsibility for the housing, health, or safety of a patient who may legally possess or cultivate marijuana.]]" (New Jan. 2006, rev. June 2007, some italics added.)
[6] In light of our disposition, we conclude it is unnecessary to resolve whether the trial court erred, and whether that error, if any, was prejudicial, when it limited the testimony of Archer's defense expert. *Page 314