Filed 10/7/14  P. v. Vega-Sanchez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059175 |
| v. | (Super.Ct.No. RIF1204066) |
| MARIO JESUS VEGA-SANCHEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Mario Jesus Vega-Sanchez is serving an effective term of 23 years to life after a jury convicted him of attempted premeditated murder, assault with a deadly

1

weapon and felony hit and run for purposely running over a woman with his car in the parking lot of a bar. In this appeal, defendant argues: (1) insufficient evidence supports the jury's verdict that the attempted murder was willful, deliberate and premeditated; (2) the trial court erred when it refused to instruct the jury with Judicial Council of California Criminal Jury Instructions, CALCRIM No. 3404 on the defense theory of accident; and (3) the trial court violated Penal Code section 654[1] when it sentenced defendant on both the attempted murder and the hit and run convictions because both crimes were committed incident to a single objective. As discussed below, we affirm the conviction and sentence.

### FACTS AND PROCEDURE

On October 18, 2012, the People filed an information charging defendant with attempted first degree murder (§§ 664/187, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), and felony hit and run with injury (Veh. Code, § 20001, subd. (a)). The People also alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) regarding the attempted murder and assault charges, and that serious permanent injury to the victim resulted (Veh. Code, § 20001, subd. (b)(2)) regarding the hit and run charge.

At trial, the owner or manager of the bar testified that she was at the cash register in the early morning hours of July 16, 2012, when she saw about six strangers, including defendant, arguing amongst each other. The argument continued outside the bar and

---

[1] All section references are to the Penal Code unless otherwise indicated.

2

escalated to a physical fight, with about 15 people participating. There was screaming, and people were throwing punches and kicking, but she did not observe any weapons. The fight was getting out of hand, beyond the control of the bar's security guards. The owner called the police about three times. The owner recognized defendant from the fight. He was at the bar with "about three other guys," with whom he had been sitting at a table. All four men were involved in the fight outside. The owner said defendant was kicking people and throwing punches and said "it was a big ol' commotion." People were kicking and punching defendant as well.

Defendant got into a gray P.T. Cruiser by himself and drove out of the parking lot. He turned left onto Limonite and the owner thought he had left for good. About a minute later defendant sped back into the parking lot going "really fast." The people who were still standing around in the parking lot began to spread out because "They were scared to get hit." Defendant made a u-turn in the parking lot and people scattered to get out of his way. The owner opined when asked that, if the people had not gotten out of defendant's way, they would have been hit. After making the u-turn, defendant hit a short retaining wall, backed up, and then went forward. Defendant was going fast at that point because his tires were burning and when he hit the wall it made a loud noise. After backing up from the wall, defendant went forward again and hit head on a woman who was standing in the parking lot. Defendant pushed her back into another car, pinning her to it. The woman was screaming and appeared to be very scared. After hitting her, defendant continued forward to hit several other cars, then backed up and drove forward out of the parking lot. The woman fell to the ground. She was not in the way of the exit, so

3

defendant could have left the parking lot without hitting her. Defendant made no move to avoid hitting her. The bar owner went over to help the woman and saw tire marks on her leg. The woman said she was in a lot of pain.

A bar patron testified that, after the fight moved outside, she eventually saw defendant driving a gray or silver P.T. cruiser around the parking lot. The car was speeding around the parking lot very fast, swerving. She said "yes" when asked if she could see or hear the car's tires burning. The patron said she saw people running and jumping out of the way of the car, and she thought "people were going to get run over." She believed the people would have been hit by the car if they had not gotten out of the way. After she saw the car hit the small brick wall at a high rate of speed, the car backed up and then went forward. "We thought it was . . . basically just trying to hit people." Out of the side of her eye, the bar patron saw something fly up, and when she turned around to look she noticed the woman was lying on the ground. After the car hit the woman, it then continued forward and hit another car. The car then backed up and exited the parking lot. The bar patron helped the woman and heard her say she was in pain and did not know what had happened. Her clothes were ripped and had tire marks on them, as did one of her legs.

One of the responding sheriff's deputies testified that when he first saw defendant, defendant had removed his shirt and was walking on Limonite away from the area where the bar was located. When the deputy told defendant to stop, defendant turned around to look at the deputy, then he jumped over a block wall into the back yard of a residence. After considerable effort, the deputy and another arriving deputy eventually apprehended

4

defendant as he left the rear garage door of that residence. Defendant was holding a tire iron, but dropped it and lay down on the concrete when commanded to do so.

The woman defendant hit with his car, Ms. Beltran, testified that she went to the bar on the evening of July 16, 2012 and spent time with friends. She did not remember going outside into the parking lot or being injured there, and she did not recognize the defendant. She just remembered waking up in the hospital. Ms. Beltran was in the hospital for about a month, and then spent another month in a second hospital. She was scheduled for another surgery on her leg the day following her testimony at trial. She testified that her knee was completely shattered and that her long hospital stays were needed "Because of the injury I had to my leg. Well, they were trying to save my leg." She testified that she had many broken bones in her leg, had screws in her knee and leg to hold them together, and was in a lot of pain. She could only walk using a walker, and could no longer work as a cook. She suffered a recurring infection in her leg from "[s]upposedly the tire or the car that ran me over." She had scars on the top of her thigh from where the car tire burned her, and required plastic surgery.

On March 27, 2013, a jury found defendant guilty of all three charges and found true each of the allegations.

On March 28, 2013, defendant admitted that he had a prior strike conviction and serious felony conviction (§§ 667, subds. (a), (c) and (e)(1) and 1170.12, subd. (c)(1)) and a prior prison term conviction (§ 667.5).

On July 12, 2013, the trial court sentenced defendant to a total determinate term of nine years and four months, to be followed by an indeterminate term of 14 years to life,

5

as follows: seven years to life for attempted murder, doubled to 14 years to life for the prior strike, plus three years consecutive for the great bodily injury allegation, plus 4 years consecutive (stayed pursuant to § 654) for the assault, plus three years consecutive for the other great bodily injury allegation (stayed pursuant to § 654), plus sixteen months consecutive for the hit and run, plus five years for the prior serious felony conviction.

This appeal followed.

**DISCUSSION**

*1. Sufficient Evidence of Willfulness, Deliberation and Premeditation*

Defendant argues the evidence was insufficient to support the charge of attempted willful, deliberate and premeditated murder.

We review the record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence, including circumstantial evidence, which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

The jury was instructed on attempted first degree murder based on CALCRIM No. 601.[2] "An intentional killing is premeditated and deliberate if it occurred as the

---

[2] "If you find the defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] The defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting. [¶] The length of time the person spends considering whether to kill does not

*[footnote continued on next page]*

result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543, citing *People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) However, the reflection necessary to establish premeditation and deliberation need not take an extended period of time: ""Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 332.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the court identified three categories of evidence pertinent to determining premeditation and deliberation: (1) facts about a defendant's behavior before the killing that show planning; (2) facts about any relationship between the defendant and the victim suggesting a motive; and (3) facts about the manner of the killing that show the defendant intentionally killed the victim according to a preconceived plan. (*Id.* at pp. 26-27.) "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247, citing *Perez, supra*, 2 Cal.4th at p. 1125.)

---

*[footnote continued from previous page]*
alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

Here, the facts show that defendant initially left the parking lot in his car, thus completely ending his participation in the brawl taking place in the parking lot. About a minute later, defendant must have changed his mind, because he returned in his car to the parking lot "going really fast," requiring the people standing in the parking lot to get out of his way to avoid being run over by him. Defendant then made a u-turn, hit a short retaining wall at high speed, then backed up and went forward, at which time he hit Ms. Beltran head-on and pinned her to a parked car. These facts show that defendant had time to get away from the explosive situation in the parking lot, from which he was absent for more than a minute, before he made a conscious decision to return and escalate. That is substantial evidence of a pre-conceived plan, in particular a plan to hit people with his car. In addition, even after he re-entered the parking lot, defendant purposely changed direction three times before hitting Ms. Beltran—first when making the u-turn, second when backing up after hitting the retaining wall, and third when going forward, at which time he attempted to murder Ms. Beltran. Each of these direction changes was a separate decision, indicating defendant's actions were willful, deliberate and premeditated. Finally, the lack of a direct relationship between defendant and Ms. Beltran does not in any way detract from his motive for hitting her with his car. His actions show a plan to hit anyone in the parking lot that night who was in reach of his car—the motive was apparently anger and/or revenge, directed toward anyone in the parking lot. For these reasons, we find substantial evidence to support the jury's verdict that defendant acted willfully, deliberately and with premeditation.

8

2. *The Trial Court Need Not Have Instructed the Jury on Accident.*

Defendant also argues the trial court erred when it declined his request to instruct the jury with CALCRIM No. 3404, which explains that a defendant is not guilty of a charged crime if he acted "without the intent required for that crime, but acted instead accidentally."

During discussions on jury instructions after the close of evidence, the defense asked the trial court to instruct the jury with CALCRIM No. 3404. The court was disinclined to do so based on the lack of evidence that defendant acted accidentally. When asked to pinpoint the evidence supporting an accident instruction, the defense was unable to cite to any. The court denied the request because it could find no substantial evidence of accident.

"'A person who commits a prohibited act "through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence" has not committed a crime. [Citation.] Thus, a felon who acquires possession of a firearm through misfortune or accident, but who has no intent to exercise control or to have custody, commits the prohibited act without the required wrongful intent.' [Citation.]" (*People v. Kim* (2011) 193 Cal.App.4th 836, 846.)

Because the so-called "defense" of accident is actually a claim that the prosecution has failed to prove the intent element of the crime, the trial court has no duty to instruct on it sua sponte. (*People v. Anderson* (2011) 51 Cal.4th 989, 997.) "A trial court's responsibility to instruct on accident . . . generally extends no further than the obligation

to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*Ibid.*)

"A trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence. [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 214-215.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]' [Citations.]" (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Here, there simply was no evidence provided to the jury that defendant accidentally ran over Ms. Beltran. Defendant did not testify at trial and the defense put on no witnesses. Although defense counsel briefly argued to the jury what could charitably be described as an accident theory of the case [". . . when he got outside that bar, he was outnumbered. He was bloody. He was trying to get away. There was no premeditation involved here. Simple, basic animal instinct. Get away. He panicked. . . . [¶] . . . He never intended to hurt her or kill her"], there had to be actual, substantial evidence of accident to merit the pinpoint instruction. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 925.) Even in this appeal, defendant points only to the following evidence in the record—that defendant was drunk and behaving irrationally inside the bar, that his conduct behind the wheel was described as "speeding around swerving in the parking lot" and "driving recklessly," and that the scene in the parking lot was "chaotic." He also points to the lack of testimony that defendant saw Ms. Beltran before he hit her

with his car.  None of this testimony about defendant's reckless driving and general chaos in the parking lot is substantial evidence that defendant acted accidentally.  Therefore, the trial court did not err when it denied the defense request to instruct the jury on accident.

3.  *The Attempted Murder and Hit-And-Run Were Committed with Two Separate Objectives.*

Finally, defendant argues section 654 prohibits him from being punished for both the attempted murder and the felony hit-and-run because he committed both crimes with a single intent and objective.

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "The purpose of this legislative protection against punishment for more than one violation arising out of an 'act or omission' is to insure that a defendant's punishment will be commensurate with his culpability."  (*Perez, supra,* 23 Cal.3d at pp. 550-551.)

"[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. . . .  If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."  (*Perez, supra*, 23 Cal.3d at p. 551.)  Whether a course of conduct is divisible and thus gives rise to more than one act under section 654 depends on the defendant's intent and objective.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  If

11

all of a defendant's offenses were incident to one objective, he or she may be punished for any one of the offenses, but not more than one. (*Ibid.*) However, if a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he or she may be punished for the independent violations committed in pursuit of each objective even though the violations were part of an otherwise indivisible course of conduct. (*Perez*, at p. 551.)

Whether section 654 applies is generally a question of fact. (*Perez, supra*, 23 Cal.3d at p. 552, fn. 5.) A trial court's finding (even if implied) that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

Defendant identifies his single intent and objective as "a plan to murder [Ms. Beltran] and get away with it by fleeing the scene." This seems to us very much like two quite distinct objectives—the first to murder Ms. Beltran or anyone that he could manage to hit with his car, and the second to get away with it by fleeing the scene.

"[T]o reiterate, the purpose of . . . section 654 . . . is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Butler* (1986) 184 Cal.App.3d 469, 474 [Fourth Dist., Div. Two].) When defendant fled the parking lot after he had already tried to kill Ms. Beltran, he put others in the parking lot in further danger of being run over, and risked injury to the deputies who pursued him, as well as to the resident(s) of the home where he hid and anyone else who might have gotten in the way of his flight. For these reasons, the trial court did not err when it imposed but did not stay the sentence for felony hit and run.

12

**DISPOSITION**

The conviction and sentence are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
                                                                P. J.


We concur:

KING_____
                          J.

MILLER_____
                          J.

13