Filed 12/3/25  P. v. White CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B331879 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA498963) |
| v. | |
| MARTEL LATRICE WHITE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shelly Torrealba, Judge.  Affirmed in part, reversed in part, and remanded with directions.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising

Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

_____

Martel Latrice White appeals from a judgment of conviction entered after a jury found him guilty of the voluntary manslaughter of Johnathan McGhee. White contends on appeal that the trial court erred by failing to instruct the jury on justifiable homicide based on defense of others and defense of property. We conclude there was not substantial evidence to support those instructions and any error in not instructing was harmless.

White also argues the court erred by imposing upper term sentences on the manslaughter conviction and firearm enhancement because White did not knowingly, intelligently, and voluntarily waive his right to a jury trial on the alleged aggravating factors. The Attorney General concedes and we agree that White did not personally waive his right to a jury trial on the aggravating factors that supported imposition of the upper term, and the error was prejudicial. We affirm the conviction, vacate the sentence, and remand for the People to have an opportunity to try the aggravating factors before a jury and for the court to resentence White.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Evidence at Trial*
On July 28, 2021 White borrowed a car from Kayla Thomas, with whom White had one child. White drove Thomas's car to the home of Deona Jackson to pick up Jackson and their two children, a three-year-old boy and a one-year-old girl. White

2

and Jackson dropped their son at school and then drove to White's apartment. White parked Thomas's car in his apartment building's parking lot and left Thomas's keys in his apartment. White and Jackson then took White's car to get his windshield fixed, run errands, and pick up their son at school. White was carrying a gun in his pocket that day because he recently had been followed by an unknown person.

While White and Jackson were running errands, Thomas called White twice, asking him to return her car. White told Thomas that he would meet her at his apartment to return her car. After the second call from Thomas, however, McGhee called White and yelled at him to "give [Thomas] her shit back."[1] McGhee sounded "angry and very hostile." White told McGhee he would bring the car out of the parking lot and leave it on the street for Thomas with the keys in the car. But because of McGhee's hostile tone, White told him not to come to the gate of White's apartment building.

White and Jackson returned to White's apartment building with their two children. White parked his car in the building's parking lot, which was accessible by a gated driveway. As they were getting the children out of the car, Jackson noticed McGhee walking up the driveway toward them. When McGhee was only a few feet away from White, McGhee began aggressively yelling,

---

[1] White testified that he first met McGhee when White was a teenager and dating Thomas. At the time, McGhee was Thomas's downstairs neighbor, and McGhee was angry that White was dating her. On one occasion when White was leaving Thomas's apartment, McGhee swung at him, and the two fought. White did not see McGhee again until about a month before the shooting.

3

"Where the fuck the keys at?" and "I'ma beat your ass for this car." White replied, "I'm finna give you the key. . . . My kids is right here, like, there's no need for—like, just chill out." White was surprised McGhee had come into the parking lot because White had told him to wait on the street.

At this point, White saw Romeo Morris walk up the driveway. White knew Morris was McGhee's friend. Morris had both hands in his pockets, and White saw that Morris was holding a gun in his right pocket. McGhee gestured for Morris to stay back, and Morris retreated to about 10 to 15 feet away from White and McGhee.

White tried to get into his apartment, but his key would not work in the lock. A neighbor saw White and told him the building manager had changed the locks earlier that day and White would need to contact the manager for a new key. White explained to McGhee that Thomas's car keys were inside his apartment and White would need to call the building manager to retrieve them, but McGhee was still angry. McGhee told White, "I'm going to beat your ass." Jackson, who was holding their one-year-old, stepped between the two men in an attempt to diffuse the situation. She said, "It's not going to be no fighting. My kids right here." McGhee aggressively slapped her hand away and said, "Fuck them kids. I don't give a fuck, I'll slap you and those kids." Jackson walked away with the children toward the door of the apartment building. When she turned to get her son, she saw Morris point a gun at White. She grabbed her children and ran between two cars "for cover." She heard gunshots but could not see who was shooting because she was "cover[ing]" her children, and she did not come out from "ducking" behind the car until after the shooting.

4

White testified that he had again explained he was trying to get the car keys from inside his apartment when he saw McGhee turn and look over his shoulder toward Morris. White saw Morris take his gun out of his pocket and raise it to his chest. McGhee told White not to "try anything" or he "was going to die." McGhee started to raise his arm to swing at White. Jackson had grabbed their son, and she had backed up. White jumped back out of the sight of Morris's gun sight, removed his gun from his pocket, and fired two shots at McGhee. At the same time Morris was shooting at White. McGhee fell to the ground, and Morris ran away up the driveway. White ducked, and he and Jackson got into the car with the children and drove away.

McGhee was shot twice, once in the shoulder and once in the head. He was pronounced dead at the scene.

White also testified regarding his state of mind during the confrontation. He said that when he first saw McGhee, it seemed like McGhee wanted to fight. Morris showed up with a gun, and White was "terrified" and "didn't know what to think." White assumed McGhee had a gun because he saw that Morris had a gun. After realizing he was locked out of his apartment, White was "terrified because this man is still aggressively angry about me getting these keys and I can't get him what he wants." McGhee was "at an extreme level of anger." When White saw Morris take out his gun, White "had to make the best options I thought, to save my life." After firing at McGhee, White wanted "to get [his] kids to safety" before Morris came back. White testified that he shot McGhee because "I felt, in my heart, I was going to die."

B.     *The Jury Instructions, Verdict, and Sentencing*

The trial court instructed the jury on first and second degree murder (CALCRIM Nos. 520 and 521), as well as justifiable homicide based on self-defense (CALCRIM No. 505) and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).

The jury found White guilty of voluntary manslaughter (Pen. Code, § 192, subd. (a))[2] and found true the special allegation White personally used a firearm (§ 12022.5, subd. (a)).  The jury also found White guilty of assault with a firearm (§ 245, subd. (a)(2)) and possession of a firearm by a felon (§ 29800, subd. (a)(1)).

In a bifurcated bench trial on the alleged aggravating factors under California Rules of Court, rule 4.421,[3] the trial court found true that the offenses involved great bodily harm and exhibited a high degree of callousness, viciousness, and cruelty (rule 4.421(a)(1)), the offenses indicated a serious danger to society (rule 4.421(b)(1)), and White had served a prior prison term (rule 4.421(b)(3)).  The court sentenced White to an aggregate term of 21 years in state prison.  The court imposed on count 1 for voluntary manslaughter the upper term of 11 years, plus the upper term of 10 years for the firearm enhancement. The court imposed on count 2 for assault with a firearm a one-year term (one-third the middle term of three years), plus eight months on count 3 for possession of a firearm by a felon (one-third the middle term of two years).  The court ordered the

---

[2]     Further statutory references are to the Penal Code.

[3]     Further references to rules are to the California Rules of Court.

6

sentences on counts 2 and 3 to run concurrent to the sentence on count 1.[4] White timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err in Not Instructing the Jury on Defense of Others and Defense of Property, and Any Error Was Harmless*

1.  *Governing law and standard of review*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case that are "'''closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.''''" (*People v. Valdez* (2004) 32 Cal.4th 73, 115; accord, *People v. Young*

---

[4]  The trial court appears to have imposed a consecutive sentence (one-third the middle term) to run concurrent to the voluntary manslaughter count. However, as the Court of Appeal explained in *People v. Neely* (2009) 176 Cal.App.4th 787, 799, if a court elects "to run one or more of the determinate terms concurrently, it would impose the full selected base term and order it to be served concurrently with the principal term." (See §§ 669, subd. (a) ["When a person is convicted of two or more crimes, . . .[the] judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively"]; 1170.1, subd. (a) ["The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed"].) Accordingly, at resentencing, if the court imposes concurrent terms on counts 2 and 3, it needs to impose a full base term (not one-third the middle term) after selecting the base term consistent with then-current sentencing laws.

(2005) 34 Cal.4th 1149, 1200.)  This obligation includes a sua sponte duty to instruct the jury on "any affirmative defense for which the record contains substantial evidence [citation]— evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case." (*People v. Salas* (2006) 37 Cal.4th 967, 982; accord, *People v. Mentch* (2008) 45 Cal.4th 274, 288; *People v. Breverman* (1998) 19 Cal.4th 142, 157.)

Substantial evidence in this context is evidence ""'sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.)  An instruction is not required where only "[s]peculative, minimal, or insubstantial evidence" supports the instruction.  (*People v. Simon* (2016) 1 Cal.5th 98, 132, 134.)  In deciding whether to give a defense instruction, the court must "view the evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

We review a defendant's claims of instructional error de novo.  (*People v. Simon, supra,* 1 Cal.5th at p. 133; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

> 2. *Substantial evidence did not support an instruction on defense of others*

As discussed, the trial court instructed the jury on self-defense as a complete defense to murder with CALCRIM No. 505, which the jury rejected in favor of finding White guilty of voluntary manslaughter based on imperfect self-defense.  White contends the court had a sua sponte duty to instruct the jury on defense of others as a complete defense because substantial evidence supported a finding that White was reasonable in

8

believing there was an imminent threat to his children.  White's contention lacks merit.

With respect to homicide, "[s]elf-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime."  (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134; see § 197, subds. (1) & (2); CALCRIM No. 505.)  "'For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.'"  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; accord, *People v. Horn* (2021) 63 Cal.App.5th 672, 682; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 ["Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself."].)[5]

---

[5]     A murder charge may alternatively be mitigated by imperfect self-defense, reducing the offense (as the jury did here) to voluntary manslaughter.  "If the belief [in the need to defend oneself] subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter."  (*People v. Humphrey, supra*, 13 Cal.4th at p. 1082; accord, *People v. Horn, supra*, 63 Cal.App.5th at p. 682; see *People v. Booker* (2011) 51 Cal.4th 141, 182 ["Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury."]; CALCRIM No. 571.)

Justifiable homicide on the basis of defense of others consists of substantially the same elements as self-defense. The jury must find: (1) the defendant reasonably believed that someone else was in imminent danger of being killed or suffering great bodily injury; (2) the defendant reasonably believed the immediate use of deadly force was necessary to defend against that danger; and (3) the defendant used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505; see also *People v. Butler* (2009) 46 Cal.4th 847, 868 ["[B]oth self-defense and defense of others . . . require an actual fear of *imminent* harm."].)

Substantial evidence did not support an instruction on defense of others. Both White and Jackson testified McGhee threatened to beat up or kill White, but McGhee did not threaten the children with serious harm. After McGhee slapped Jackson's hand away, he said, "Fuck them kids. I don't give a fuck, I'll slap you and those kids." However, Jackson was able to immediately grab the children and walk with them toward the apartment building and away from the altercation. As soon as she saw a gun, she was able to hide behind a car with the children, and she did not come out until the shooting stopped. There was no testimony that anyone pointed a gun at the children or threatened to kill or seriously harm them. These facts do not support an inference the children were in imminent danger.

Further, there was no evidence White had an actual belief that his children were in imminent danger. White testified multiple times that he was afraid for his own life, but he never stated he feared McGhee or Morris would kill or seriously harm his children. The only time in his testimony that White mentioned "getting his children to safety" was *after* he shot

10

McGhee and wanted to flee to avoid potential retribution from Morris. (See *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 [instruction on defense of others requires "evidence from which the jury could find that appellant actually had such a belief" in the need to defend against imminent peril].)

>    3.     *Even if the trial court erred in not instructing on defense of others, any error was harmless*

The Attorney General contends that even if the trial court failed to instruct the jury on defense of others, the error was harmless under the standard for state law error set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, because it is not reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. White argues we should apply the harmless-beyond-a-reasonable-doubt standard applicable to federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), because the failure to instruct on defense of others violated his federal constitutional rights.

The Supreme Court has not yet decided which test for prejudice applies to a failure to instruct on an affirmative defense "such as self-defense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199 ["we have yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"]; compare *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52-53 [failure to instruct on self-defense was reversible error under *Watson*] with *People v. Quach* (2004) 116 Cal.App.4th 294, 303 [applying *Chapman* standard to erroneous self-defense instruction]; cf. *People v. Schuller* (2023) 15 Cal.5th 237, 254 ["a trial court's failure to instruct on imperfect self-defense amounts

11

to an incomplete instruction on the malice element of murder and is therefore subject to *Chapman* review for constitutional error"].)

Even under *Chapman*'s more stringent standard, any error was harmless. In applying *Chapman*'s beyond-a-reasonable-doubt standard in the context of an instructional error that "''misdescri[bes] . . . the elements'" of the charged offense" (here, not instructing on defense of others), we "''ask[] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.''" (*Schuller, supra,* 15 Cal.5th at p. 261, quoting *In re Lopez* (2023) 14 Cal.5th 562, 581.) Applying this stringent standard, any error in not instructing the jury on defense of others was harmless because there is no evidence in the record that could have rationally supported a jury finding that White killed McGhee in defense of Jackson or the children.

As discussed, the trial court instructed the jury with CALCRIM No. 505 on self-defense that White was not guilty of murder or manslaughter if (1) he reasonably believed he was in imminent danger of being killed or suffering great bodily injury, and (2) he reasonably believed the immediate use of deadly force was necessary to defend against that danger, and (3) he used no more force than was reasonably necessary. The court also instructed the jury pursuant to CALCRIM No. 571 that a murder is reduced to voluntary manslaughter if the defendant actually believed he was in imminent danger of being killed or suffering great bodily injury, *and* he actually believed the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable.

12

By finding White guilty of voluntary manslaughter, the jury necessarily found White had an actual *but not reasonable* belief he was in imminent danger of being killed or suffering great bodily injury. Given that White had been the subject of more violent threats from McGhee and was standing a few feet from him, a rational jury could not have found the same circumstances that led to his not having a *reasonable* belief of harm to himself supported a *reasonable* belief that Jackson or the children were in immediate danger of being killed or suffering great bodily injury. As discussed, McGhee told White he was "going to beat [his] ass," and when Morris pulled out his gun, McGee threatened that if White did anything, "[he] was going to die." McGhee then started to swing at White. By contrast, when Jackson intervened and said there would be no fighting, McGhee slapped her hand and said he would slap her and the children (not kill or seriously harm them). In addition, McGhee was standing only feet from White, and Morris had just pulled out a gun when White responded by shooting McGhee, but by that time, Jackson had moved with the children to take cover behind a car. On this record, if the jury found White did not have a reasonable belief that it was necessary to immediately use deadly force to defend against the danger to himself, a rational juror would not have found White had a reasonable belief that deadly force was necessary to defend against any danger to Jackson and the children.

13

4.   *Substantial evidence did not support an instruction on defense of property*

White also argues the trial court erred by failing to instruct the jury with CALCRIM No. 506 regarding justifiable homicide based on defense of property (the parking area in front of White's apartment building). Pursuant to section 197, subdivision (2), homicide is justifiable "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein."

While this language appears to permit killing in defense of property to prevent *any* felony, the Supreme Court in *People v. Ceballos* (1974) 12 Cal.3d 470, 478-479 held that "killing or use of deadly force to prevent a felony was justified only if the offense was a forcible and atrocious crime[,]" such as "murder, mayhem, rape and robbery" or a felony that "threatened, or was reasonably believed to threaten, death or serious bodily harm." "Accordingly, a homicide involving the *intentional* use of deadly force can never be justified by defense of habitation [or property] alone. The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home [or on the property]." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360; see Bench Notes to CALCRIM No. 506 ["[A]lthough the statute refers to 'defense of habitation,' *Ceballos* requires that a person be at risk of great bodily harm or an atrocious felony in order to

14

justify homicide.  [Citation.]  The instruction has been drafted accordingly."].)

In light of our finding that substantial evidence did not support an instruction regarding defense of others (and the jury found White did not have a reasonable belief in the need to use deadly force in self-defense), it follows that there was not substantial evidence to support a finding of defense of property based on a reasonable belief by White of imminent danger to himself, Jackson, or the children.  And, as discussed, any error in not instructing the jury on defense of others was harmless beyond a reasonable doubt under *Chapman*.

B.    *The Trial Court Erred by Imposing Upper-term Sentences for Voluntary Manslaughter and the Firearm Enhancement*

1.    *Procedural history*

While the jury was deliberating, the trial court inquired of the parties how they intended to proceed on the aggravating factors alleged in the information.  The court asked, "Is there going to be a stipulation?  Do you want to argue to the jury?"  White's counsel responded, "The defense would waive jury for the aggravating factors."  Three months later at the sentencing hearing, the court stated, "I understand that Mr. White waived his right to a jury trial on the aggravating factors."  After hearing argument on the aggravating factors, the court found three of the aggravating factors true and sentenced White to the upper terms on voluntary manslaughter and the firearm enhancement.

2.    *White did not provide a valid waiver of his right to a jury trial on the aggravating factors*

The Sixth Amendment right to a jury trial prohibits a court from imposing a greater sentence "based on a fact, other than a

15

prior conviction, not found by a jury or admitted by the defendant." (*Cunningham v. California* (2007) 549 U.S. 270, 275; accord, *People v. Lynch* (2024) 16 Cal.5th 730, 776.) Rather, "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury . . . and established beyond a reasonable doubt." (*Cunningham*, at p. 281; accord, *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) This includes the facts underlying aggravating factors, special circumstance allegations, and sentencing enhancements. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1220 [upper term sentencing enhancement violates Sixth Amendment if "none of the aggravating factors on which the court relied to impose them had been found true by the jury or admitted by [defendant]"].)

California's determinate sentencing scheme incorporates this constitutional principle. Section 1170, subdivision (b), provides, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms," "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1) & (2).) Notwithstanding these provisions, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).)

A defendant may waive his right to a jury trial on the aggravating factors, provided he does so personally and

16

expressly. (See *People v. Collins* (2001) 26 Cal.4th 297, 308; *People v. French* (2008) 43 Cal.4th 36, 47 [jury trial on aggravating factors "is guaranteed by the federal Constitution" and thus "require[s] an express waiver"].) A jury trial waiver must also be "'knowing and intelligent, that is, ""made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,""' as well as voluntary ""'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.""'" (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166.) We review the validity of a jury trial waiver under "'the totality of the circumstances' unique to each case." (*People v. Morelos* (2022) 13 Cal.5th 722, 753; accord, *Sivongxxay*, at p. 167.)

White contends, the Attorney General concedes, and we agree that White did not personally waive his right to a jury trial or make a knowing and intelligent waiver of that right. The Attorney General also concedes the violation of White's right to a jury trial on the aggravating factors is not harmless beyond a reasonable doubt. Accordingly, we must reverse White's sentence. (*People v. Lynch, supra,* 16 Cal.5th at p. 776.) "'"The proper remedy for this type of failure of proof—where . . . [aggravating facts] were 'never tried' to the jury—is to remand and give the People an opportunity to retry"' the aggravating facts." (*Ibid.*) We therefore remand to allow the People an opportunity to elect whether to retry the aggravating factors before a jury.

17

## DISPOSITION

The conviction is affirmed.  The sentence is vacated and the matter is remanded for the People to elect whether to retry the aggravating factors before a jury.  Following a retrial (or election not to retry the aggravating factors), the court shall resentence White in conformity with section 1170, subdivision (b), and any ameliorative changes in the sentencing laws.


FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.

18